**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **CHAPTER 11 CASE** |
| | § | |
| **AGE REFINING, INC.,** | § | **CASE NO. 10-50501** |
| | § | |
| **Debtor.** | § | |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY OF LISA TREFGER,**
**DIRECTOR OF BUSINESS ADMINISTRATION AND REGULATORY AFFAIRS,**
**IN SUPPORT OF FIRST DAY PLEADINGS**

1.      I am Lisa Trefger, Director of Business Administration and Regulatory Affairs of Age Refining, Inc. ("AGE" or "Debtor"), the above-captioned debtor and debtor-in-possession.

2.      In my capacity as Director of Business Administration and Regulatory Affairs, I am familiar with the day-to-day operations, business affairs, and books and records of AGE.

3.      To minimize the immediate adverse effects on the Debtor of filing for Chapter 11 protection and to enhance the Debtor's prospects of a successful reorganization, the Debtor is filing a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions").  I am generally familiar with the contents of each First Day Motion (including any exhibits and attachments thereto), and I believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtor to operate in Chapter 11 with minimum disruption, loss of productivity or depreciation in enterprise value; (ii) is critical to the Debtor's achievement of a successful reorganization; and (iii) best serves the Debtor's estate and the interests of the Debtor's creditors.

4.      I submit this declaration (the "Declaration") in support of the First Day Motions.[1] Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge, (ii) documents and other information prepared or collected by other members of the Debtor's management, its employees, or its professionals, (iii) my review of relevant documents, and/or (iv) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

5.      Part I of this Declaration describes the Debtor's business, capital structure, and the circumstances surrounding the commencement of this Chapter 11 case. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

### A.      Background

6.      The Debtor commenced this case by filing a voluntary petition on February 8, 2010 (the "Petition Date"). The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in this case, and no official committee has yet been appointed by the U.S. Trustee.

### B.      Description of the Debtor

7.      AGE is a Texas corporation who, with the consent of its shareholders, elected under the Internal Revenue Code to be taxed as an S Corporation. AGE also qualifies as a

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

minority-owned business. AGE owns and operates a petroleum refinery with two processing facilities and its headquarters located in San Antonio, Bexar County, Texas. AGE has storage tanks in Elmendorf, Texas and subleases a terminal in Redfish Bay, Texas.

8. AGE employs approximately 80 employees, and is engaged in manufacturing, refining and marketing jet fuels, diesel fuels and solvents.

## C. Overview of the Debtor's Business

9. The Debtor refines crude oil to produce jet fuels, diesel products, solvents and other highly specialized fuels for its commercial, industrial and government clients. The Debtor has a 13,500 BPCD low sulfur crude unit (the "Crude Unit") and a 1,500 BPD solvent distillation unit (the "Solvent Distillation Unit"). The Crude Unit is currently permitted to operate at 21,000 BPCD, with an average through-put of 13,500 BPD. The Crude Unit was designed to process Sweet South Texas Condensate or a blend of South Texas Condensate and South Texas Light Sweet Crude with a gravity of 40 - 53 APT and sulfur of less than .05 % wt. The Solvent Distillation Unit has five fractionating towers, which produce specialty fuels and solvents. The fractionators operate in a series fashion which allows close quality control of these specialty cuts, as well as, customization of these solvent products. The storage and distribution system onsite at the refinery includes a tank farm of 162 tanks ranging in capacity from 40 to 10,000 barrels, two additive blend systems, a tank car loading facility and two transport loading systems. There is also a tank farm in Elmendorf, Texas. The total capacity of the Elmendorf tank farm is 208,000 barrels, which provides the Debtor with the ability to control both product and crude inventory, as well as blending operations. Because it is landlocked, the San Antonio refinery also has full rail access and loading capabilities for product distribution and crude receiving. The majority of the Debtor's specialty jet fuels are shipped via rail car to destinations throughout the United States.

10.     The Debtor has government contracts to supply JP-8 (jet fuels) to three local United States Air Force bases.  These contracts represent approximately 17% to 19% of the Debtor's revenues for the years ended December 31, 2008 and 2007, respectively.  AGE also has an annual contract with the United States Air Force to supply TS-Kero, with one-year renewal options extending through March 31, 2012.  This contract represented approximately 3% of the Debtor's revenues for each of the years ended December 31, 2008 and 2007.

### D.     AGE's Liabilities

11.     AGE's estimated liabilities as of the Petition Date (exclusive of accrued and unpaid interest, any asset retirement obligations and other accrued liabilities), are as follows:

| Creditor | Approx. Amount | |
|---|---|---|
| Prepetition Revolving Facility | $50.0 Million | (not drawn) |
| Prepetition Construction  Loan | $29.6 Million | |
| Second Lien Credit Agreement | $10.0 Million | |
| Standby Letters of Credit | $29.6 Million | (not drawn) |
| Accounts Payable/Crude Vendors | $22.0 Million | |
| Accounts Payable/Non-Crude Vendors | $6.3 Million | |
| **TOTAL:** | **$148 Million** | |

### E.     The Debtor's Relationship with its Secured Creditors

12.     Before the Petition Date, the Debtor obtained financing from two primary sources.  The Debtor is a borrower under a revolving line of credit pursuant to that certain *Amended and Restated Credit Agreement,* dated September 12, 2008, as amended by *First Amendment to Amended and Restated Credit Agreement*, dated March 26, 2009 (the "Revolving Facility") with JPMorgan Chase Bank, N.A. ("JPMorgan"), as the administrative agent (the "Revolving Agent") for the lenders thereunder (the "Revolving Lenders").  Pursuant to the Revolving Facility, the Revolving Lenders provided a total commitment of $50,000,000 (the "Revolving Facility Commitment") under various revolving loans and letters of credit.  As of the Petition Date, the Debtor carried a zero balance under the Revolving Facility (the "Revolving

4

Facility Indebtedness"). The Revolving Facility Indebtedness is secured by, *inter alia*, the Debtor's inventory, accounts receivable and cash collateral account (the "Revolving Facility Collateral").

13.     Second, the Debtor is a borrower under that certain *Amended and Restated Credit Agreement,* dated September 12, 2008, as amended by *First Amendment to Amended and Restated Credit Agreement*, dated March 26, 2009 (the "Construction Loan") with Chase Capital Corporation ("Chase Capital"), as the administrative agent ("Construction Loan Agent") for the lenders under the Construction Loan (the "Construction Lenders"). Pursuant to the Construction Loan and associated documents, the Debtor had access to $46,000,000.00 (the "Construction Loan Commitment") through two separate notes. As of the Petition Date, approximately $29,600,000.00 was outstanding under the Construction Loan (the "Construction Loan Indebtedness"). The Construction Loan Indebtedness is secured by, *inter alia*, the Debtor's real property, plants, certain expansion construction contracts, and substantially all of the Debtor's equipment (collectively, the "Construction Loan Collateral").

14.     Also before the Petition Date, the Debtor entered into that certain *Second Lien Credit and Security Agreement,* dated as of September 12, 2008, as amended by *First Amendment to Amended and Restated Credit Agreement*, dated March 26, 2009 (the "Second Lien Agreement") with Chase Capital, as the administrative agent (the "Junior Administrative Agent") for the lenders under the Second Lien Agreement (the "Junior Lenders"). Pursuant to the Second Lien Agreement, the Junior Lenders committed an additional $10,000,000.00 of financing to the Debtor, secured by second liens on the same Construction Loan Collateral. As of the Petition Date, the total outstanding indebtedness under the Second Lien Agreement was $10,000,000.00 (the "Second Lien Indebtedness").

15.     JPMorgan has also issued approximately $29.6 million in standing letters of credit (the "Letters of Credits"), which remain outstanding but uncalled as of the Petition Date.  The outstanding Letters of Credit are as follows:

- CTCS-523498: $3,300,000. Exp. Feb. 28, 2010, for Gulfmark Energy, Inc.
- CTCS-537859: $23,072,866. Exp. Feb. 28, 2010, for Stusco–Credit (Shell).
- CTCS-538261: $410,000.00. Exp. Feb. 28, 2010, for Genesis Crude, LP.
- CTCS-278731: $2,679,536.04. Exp. Mar. 10, 2010, for Plains Marketing, LP.
- CTCS-652201: $25,000.00. Exp. Aug. 1, 2010, for the Railroad Commission of Texas.
- CTCS-652307: $25,000.00. Exp. Aug. 31, 2010, for the Railroad Commission of Texas.
- CTCS-522269: $100,000.00.  Exp. May 1, 2010 (subject to a 36 month extension, if notice given 60 days before expiration), for James River Insurance Company.[2]

## F.     Events Leading up to the Chapter 11 Filings

16.     During 2009, the Debtor began to experience cash flow problems.  Due to the current economic recession, the Debtor is experiencing continued losses.  Over the last several months, the Debtor has been in discussions with JPMorgan and Chase Capital Corporation in an attempt to restructure the current financing.  On January 13, 2010, JPMorgan sent a Notice of Intent to Pursue Remedies to the Debtor.  Although negotiations continued, they have not been successful, and JPMorgan has informed the Debtor that it will no longer issue any Letters of Credit to the Debtor.  Letters of Credit are critical to the Debtor's operations.  Specifically, certain of the Debtor's trade vendors will not supply crude oil and other supplies to the Debtor without a letter of credit.  If Letters of Credit are not issued, the Debtor would be required to prepay all crude vendors in order to maintain a regular supply.  This cost is estimated to be $1.1 million per day which results in a weekly prepayment obligation of approximately $7.3 million.  This is based on current utilization and current crude oil prices.  Prepayment for crude oil is not a realistic option for the

---

[2] Other standby letters of credit were extended by JPMorgan but expired on January 31, 2010, or earlier.  The figures represented above do not reflect those expired letters of credit, as they were not called prior to their respective expiration dates.

Debtor on a go forward basis. Thus, the Debtor determined that it could no longer operate outside of Chapter 11 and commenced this Case on the Petition Date.

## PART II

## FIRST DAY MOTIONS

A.    **Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I)(A) Authorizing the Debtor to Use Cash Collateral, (B) Authorizing the Debtor to Obtain Postpetition Financing, (C) Granting Security Interests and/or Superpriority Administrative Expense Status to the Postpetition Lenders, and (D) Granting Adequate Protection to the Prepetition Lenders; (II) Scheduling a Final Hearing; and (III) Granting Related Relief**

17.    By the *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I)(A) Authorizing the Debtor to Use Cash Collateral, (B) Authorizing the Debtor to Obtain Postpetition Financing, (C) Granting Security Interests and/or Superpriority Administrative Expense Status to the Postpetition Lenders, and (D) Granting Adequate Protection to the Prepetition Lenders; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* (the "Financing Motion"), the Debtor seeks authority for the use of Cash Collateral and to seek postpetition financing.

18.    The Debtor has determined that it is necessary to borrow funds and use cash collateral to operate its business in Chapter 11 and for the Debtor's successful reorganization. In addition to day-to-day operations, certain expenditures related to the purchase of crude oil must be undertaken to protect the value of the Bankruptcy Estate. The postpetition credit facility and use of cash collateral will also allow the Debtor to provide assurances to service providers, vendors, suppliers, customers and employees.

19.    The use of a postpetition credit facility and of cash collateral is required to preserve and to prevent deterioration of the value of the Bankruptcy Estate. As stated above, certain of the Debtor's suppliers will not provide crude oil without the backing of letters of credit

7

or similar financial assurances. As a refinery, a steady supply of crude oil is critical to the Debtor's operations. Without the postpetition credit facility and use of the cash collateral requested in the Financing Motion, the Debtor will be unable to purchase and refine crude oil and delivery products to its customers. In addition, the use of a postpetition credit facility and cash collateral is necessary to provide working capital for the Debtor to continue its operations. Cash collateral, alone, will not be sufficient to pay all the normal operating expenses after the proposed adequate protection payments are made to the Prepetition Lenders. The Debtor believes that the proposed postpetition credit facility and the use of cash collateral will be viewed favorably by the Debtor's employees and suppliers, minimizing disruption to the Debtor's businesses and ongoing operations. Obtaining interim relief will avoid immediate and irreparable harm to the Debtor, its creditors, its business, its employees and its assets.

20. The Interim Budget itemizes the sources of funding, the cash collateral to be used and provides a weekly projection of cash receipts and expenditures. The Interim Budget includes categories of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtor's business and maintain leases until such time as a final hearing on the Motion can be held.

**B.      Motion for Order Granting Additional Time to File Schedules and Statements**

21. By the Debtor's *Motion for Order Granting Additional Time to File Schedules and Statements,* the Debtor seeks an extension of the time allotted under the Federal Rules of Bankruptcy Procedures for filing its schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "Statements").

22. The Debtor has approximately 220 creditors and numerous other parties-in-interest and operates its business from various locations. Given the size and complexity of the Debtor's business, staffing limitations, and the fact that certain prepetition invoices have not yet

been received and/or entered into the Debtor's financial systems, the Debtor has not had the opportunity to gather the necessary information to prepare and file its Schedules and Statements.

23.     Further, the efforts of the Debtor's employees during the initial postpetition period are critical, and the Debtor must devote its time and attention to business operations during the first critical weeks of this Case in order to maximize the value of its estate.

24.     I currently anticipate that a period ending forty-five (45) days after the date of the bankruptcy filing will be sufficient for the Debtor to file its bankruptcy Schedules and Statements.

**C.      Motion for Entry of Order Authorizing (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks and (B) Continued Use of Existing Cash Management System**

25.     By the Debtor's *Motion for Entry of Order Authorizing (A) Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks and (B) Continued Use of Existing Cash Management System* (the "Cash Management Motion"), the Debtor seeks an order (a) authorizing the maintenance of its existing bank accounts and the continued use of existing business forms and checks and (b) authorizing the continued use of the existing cash management system.

26.     Prior to the commencement of this Case, in the ordinary course of business, the Debtor maintained a cash management system (the "Cash Management System").  This Cash Management System is a substantially integrated and centralized cash management system consisting of a cash collateral account and a disbursement account (collectively, the "Accounts").  The Debtor's Accounts are located at JPMorgan.  JPMorgan is an authorized depository in the Western District of Texas.  The Debtor receives wire transfers and lockbox payments to the existing collateral account.  The continued utilization is essential to maintain customer receipts in a timely fashion.

27.     The Debtor believes that the continuation of certain of the Accounts is essential to a smooth transition into Chapter 11. The Debtor also requires the ability to close unnecessary Accounts and open new accounts (at authorized depositories) as needed and treat such new accounts for all purposes as Accounts of the Debtor in its capacity as debtor-in-possession. A delay in this regard would be extremely detrimental to the Debtor.

28.     By preserving business continuity and avoiding the operational and administrative paralysis that would accompany the closing of all Accounts and the re-establishment of new ones, the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate and all parties-in-interest.

29.     Authorization for the Debtor to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders and invoices) and checks existing immediately prior to the Petition Date will minimize expenses to the estates. Requiring the Debtor to change its business stock could, *inter alia*, delay payment for postpetition goods and services. Such delay would cause additional damage to the Debtor's operations at this critical juncture. The Debtor estimates that the receipt of new check stock will take no longer than two weeks.

30.     Given the size of this Case, parties doing business with the Debtor will undoubtedly be aware of the Debtor's status as a Chapter 11 debtor-in-possession. Changing correspondence and business forms would be unnecessary and burdensome to the Debtor's estate and disruptive to the Debtor's ongoing business operations.

31.     The Debtor requires continued use of certain aspects of its Cash Management System so that it may continue the uninterrupted operation of its business and be assured an orderly transition into Chapter 11. Prepetition, Debtor maintained a cash collateral account in which all payments are deposited and controlled by the secured lender, JPMorgan. The Debtor is

permitted to transfer funds from that account to a disbursement account. The Debtor uses this account to pay it payroll and other account payables.

32.     The Debtor receives invoices in paper format. The invoices are then entered into the Debtor's accounting program and first approved by the corporate controller and then by the Debtor's Director of Business Administration and Regulatory Affairs.

33.     The Debtor's payroll is prepared by the Debtor. Each employee's payroll check is directly deposited into the employee's bank account. Employees are paid bi-weekly.

34.     The Debtor submits that the practices described in the Cash Management Motion directly and indirectly help maintain and preserve the value of its business. The Debtor's operations and asset values depend on the continuation of these cash management practices. Otherwise, the Debtor might not be able to trace its receipts and disbursements or efficiently manage its liquid assets. As a result: (a) the Debtor would not be able to timely meet postpetition obligations; (b) interest on the Debtor's funds would be lost; and (c) payroll for employees would be disrupted. Accordingly, absent the relief sought in the Cash Management Motion, the Debtor's business could be disrupted and its asset values irreparably harmed.

**D.     Motion for Order (i) Allowing Certain Employees' Prepetition Priority Claims Pursuant to 11 U.S.C. § 507(a) for Certain Benefits Accrued Prepetition; (ii) Authorizing the Debtor to (a) Maintain and Honor Its Employee Compensation Obligations and (b) Pay Employees' Priority Claims; and (iii) Compelling Certain <u>Financial Institutions to Honor Prepetition Transfers</u>**

35.     The Debtor has filed a *Motion for Order (i) Allowing Certain Employees' Prepetition Priority Claims Pursuant to 11 U.S.C. § 507(a) for Certain Benefits Accrued Prepetition; (ii) Authorizing the Debtor to (a) Maintain and Honor Its Employee Compensation Obligations and (b) Pay Employees' Priority Claims; and (iii) Compelling Certain Financial Institutions to Honor Prepetition Transfers* (the "Wage Motion").

11

36.     The Debtor's workforce includes both hourly and salaried employees (collectively, the "Employees").  The Debtor also has two independent contractors.  The majority of "field" employees are paid hourly.  The Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein.  Without the requested relief, the Debtor's stability would be undermined at the outset of this Case.  Any delay in paying prepetition Employee obligations would seriously harm the Debtor's relationship with its Employees and could irreparably impair Employee morale at the very time the dedication, confidence, and cooperation of the Employees is most critical.  The Debtor faces the imminent risk that operations may be severely impaired if it is not immediately granted authority to make the payments described in the Wage Motion.

37.     As of the Petition Date, AGE employed approximately 80 Employees.  The Employees are compensated on a biweekly basis.  The next payroll is scheduled to be paid February 12, 2010, and will cover the time period from January 25, 2010 through February 7, 2010.  This payroll includes only employees currently employed.[3]  The approximate average biweekly payroll amount for Debtor is detailed below:

| Total Payroll: | Portion of Total Payroll for Taxes: |
| --- | --- |
| $235,000 | $73,000 |

38.     All of the Employee payroll obligations which accrued prior to the Petition Date are individually below the statutory amount afforded priority in 11 U.S.C. § 507(a)(4).[4]

39.     There will be sufficient cash available to pay all prepetition Employee obligations to the extent described herein as such amounts become due in the ordinary course of its business, if the requested use of cash collateral and, if applicable, post-petition financing is approved.

---

[3] The Wage Motion does not include a request to make any payments related to any severance agreements.

[4] To the extent requested by the Court, Office of the United States Trustee or any appointed Committee, the Debtor will provide a list of Employees and the amounts owed to them on account of wages or salary earned prepetition.

2863854.3

40.     The Debtor also utilizes the services of certain independent contractors.  The Debtor utilizes an environmental consultant and a consultant in Washington, D.C. on government contract issues.  The Debtor also seeks to satisfy pre-petition obligations related to the independent contractors.  The amounts paid to these independent contractors are approximately $14,400 per month.

41.     In the ordinary course of the Debtor's business, the Debtor reimburses Employees for certain business-related expenses.  The expenses are ordinary course expenses that the Debtor's Employees incur in performing their job functions.  It is essential to the continued operation of the Debtor's business that it is permitted to continue reimbursing Employees for such business-related expenses.  There are nominal amounts of unreimbursed business expenses as of the Petition Date.  Historically, the Debtor reimburse Employees (in aggregate) nominal amounts for business expenses.  The Debtor's prepetition policy has been to require Employees to submit expense reports, including receipts.  Therefore, there may be reimbursement requests, for prepetition expenses, that have not yet been provided by Employees to the Debtor.  The Debtor seeks authority to reimburse Employees for all business expenses in the ordinary course of business, including those incurred prior to the Petition Date.

42.     The Debtor's full time Employees are eligible for coverage under health, dental, long term disability and life insurance (the "Health Benefits Plan").  The Health Benefits Plan is paid in part by the Debtor and in part by individual Employees.

43.     The Debtor's obligations related to the Health Benefits Plan are paid monthly. The most recent payment, on account of the Health Benefits Plan, was made on January 15, 2010, and covered the period from December 1, 2009, through December 31, 2009.  The next payment will be due February 15, 2010, and will cover the period from January 1, 2010, through January

31, 2010.  The Debtor will owe $39,000.00 on account of the Health Benefits Plan on February 15, 2010, and such amount will be funded, in part, from payroll deductions.

44.     The Debtor also provides basic term life and long term disability benefits (the "Other Insurance Plans") to its eligible Employees.  The premiums for the Other Insurance Plans are funded by the Debtor and are approximately $4,700.00 per month.  By the Wage Motion, the Debtor seeks authorization to pay all amounts owed by the Debtor on account of the Other Insurance Plans, as they become due, in the ordinary course of its business including those obligations that arose prior to the Petition Date.

45.     The Debtor provides vacation and sick leave benefits to eligible full-time Employees.  At first, Employees receive, as compensation, one week of sick leave and two weeks of vacation leave each year.  With seniority, the employee receives additional vacation hours.  The Employees may carry over up to 90 hours of unused sick leave and up to four weeks of unused vacation time each year.  Neither accrued unused sick leave nor vacation time is paid out upon an Employee's termination of employment.

46.     The Debtor anticipates that many of its Employees will utilize any accrued sick, vacation or personal time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtor's normal payroll obligations.

47.     Debtor also provides workers' compensation benefits to Employees (the "Workers' Compensation Benefits").  The Workers' Compensation Benefits premiums are financed by Chartis.  The Debtor's monthly premium payments are approximately $5,857.00.  The Debtor's payments to Chartis historically have been due on the fourth day of each month for the previous month's coverage.  The final payment under the finance agreement is due on March 4,

2010, in the approximate amount of $5,857.00.  As of the Petition Date, there are no pending workers' compensation claims against the Debtor.

48.        In the Wage Motion, the Debtor seeks authorization to pay all Employee federal and state withholding and payroll-related taxes and obligations relating to prepetition periods including, but not limited to, all withholding taxes, Social Security taxes, unemployment taxes, Medicare taxes, Court ordered payments, and garnishments, as well as all other withholdings such as contributions to savings, retirement or pension plans, and insurance contributions, if any (collectively, the "Prepetition Withholding Obligations").

49.        The Debtor routinely withholds from Employee paychecks the Prepetition Withholding Obligations, including, without limitation, amounts deducted for child support and creditor garnishment that the Debtor is required to transmit to third parties.  The Debtor believes that such withheld funds, to the extent that they remain in Debtor's possession, likely constitute moneys held in trust and, therefore, are not property of the Debtor's bankruptcy estate.

50.        As stated above, the funds for each employee's payroll check are deposited directly into the employee's bank account.

51.        The Employees are essential to the continued operation of the Debtor's business and successful reorganization, and the Employees' morale directly affects their effectiveness and productivity.  Consequently, it is critical that the Debtor continues, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date.  If the checks issued and electronic fund transfers requested in payment of any of the Employee obligations have been or are dishonored, or if such obligations are not timely paid postpetition, the Employees will suffer extreme personal hardship and may be unable to pay their daily living

expenses. These circumstances undoubtedly will adversely affect their performance and similarly impact the Debtor's reorganization effort to the detriment of all parties in interest.

52. The Debtor's workforce is owed, on account of prepetition Employee obligations, amounts that are, individually, less than the cap given priority by section 507(a)(4) and (5) of the Bankruptcy Code. First and foremost, these Employees are critical to the Debtor's continued operations, especially in the early stages of this chapter 11 Case. The morale and work ethic of the Debtor's Employees are paramount to maintaining the current value of the Debtor's estate.

53. In order to retain Employees, and to maintain morale, the Debtor must have authority to pay or otherwise satisfy all prepetition Employee obligations, including the payment of tax and other benefits.

54. The relief requested in the Wage Motion is necessary to the Debtor's successful reorganization. The Employees are vital to the continued operation of the Debtor's business and to its successful reorganization.

E. **Motion for Entry of Order Limiting Notice and Establishing Notice Procedures**

55. By their *Motion for Entry of Order Limiting Notice and Establishing Notice Procedures* ("Limit Notice Motion"), the Debtor wishes to limit the parties to receive notice and other pleadings filed in this case.

56. Service of papers by electronic mail or by the Court's ECF system where applicable will substantially reduce costs to the estate for photocopying and postage.

57. The mailing of notices of all pleadings and other documents in this Case to all creditors and parties-in-interest, and the mailing of notices of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via certified mail, would be both impractical and impose an administrative and economic burden upon the Debtor's estate.

16

58.     Limiting service as called for in the Limit Notice Motion will make the administration of this Case more efficient and cost-effective.  Furthermore, because all creditors and other parties in interest will have the right to request notice of all proceedings in this Case and to be included on the Limited Service List at any time, the notice procedures requested in the Limit Notice Motion will not prejudice the rights of any creditor or other party in interest.  The Limit Notice Motion is in the best interest of the Debtor's estate and creditors because it will limit administrative costs and will not prejudice the rights of any creditor or party-in-interest.

**F.      Application for Approval of the Employment of Cox Smith Matthews Incorporated as Attorneys for the Debtor**

59.     The Debtor has filed an *Application for Approval of the Employment of Cox Smith Matthews Incorporated as Attorneys for the Debtor* (the "Cox Smith Application").  By the Cox Smith Application, the Debtor seeks to employ and retain Cox Smith Matthews Incorporated ("Cox Smith") as its counsel, as of the Petition Date, in connection with various matters, including the Debtor's commencement and prosecution of its chapter 11 Case.

60.     The employment of Cox Smith, as specified in the Cox Smith Application, is appropriate and necessary to enable the Debtor to execute faithfully its duties as Debtor and Debtor-in-Possession.  Cox Smith has stated its desire and willingness to act as counsel in the Case and render the necessary professional services as attorneys for the Debtor.  The Debtor has selected Cox Smith to provide it representation in the Case because their expertise with bankruptcy cases of similar size and scope is well known.

61.     Interim approval of the Cox Smith Application is necessary to avoid immediate and irreparable damage to the Debtor.  If counsel's employment has not been approved, there may be some reluctance on the part of third parties who need to negotiate with the Debtor's counsel.  Counsel must argue motions that relate to the Debtor's ability to pay employees for wages that

were accrued pre-petition. Counsel will be involved in negotiations with JPMorgan or other financial institutions in connection with postpetition financing. Interim approval of the Cox Smith Application provides counsel with authority and legitimacy, which may be questioned if not approved as counsel. Furthermore, lack of approval on an interim basis may impact whether an attorney-client relationship exists.

**G.**   **Motion for an Order (i) Authorizing the Debtor to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Bank and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

62.       The Debtor has filed the *Motion for Order (i) Authorizing the Debtor to Pay Certain Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Bank and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* (the "Tax Motion").

63.       In the ordinary course of the Debtor's business operations, it incurs certain tax obligations, including certain sales and use taxes (the "Sales and Use Taxes"), property taxes (the "Property Taxes"), federal and state leaking underground storage taxes (the "Lust Taxes"), state franchise taxes (the "Franchise Taxes"), and various other taxes and fees, including, without limitation, other federal excise taxes, state diesel, natural gas and crude oil taxes and delivery fees (the "Other Taxes" and together with the Sales and Use Taxes, Property Taxes, Lust Taxes, and Franchise Taxes, the "Taxes") and/or fees ("Fees") owed or accrued prepetition to the taxing and governmental regulatory authorities (the "Taxing and Regulatory Authorities"). Before the Petition Date, the Debtor generally paid all undisputed Taxes and Fees in a timely fashion. The Debtor has agreed that on an interim basis, pending a final hearing on the motion, the Debtor will seek approval to pay only Sales and Use Taxes, Franchise Taxes and certain Other Taxes that have accrued prepetition but will come due during the first few weeks of the bankruptcy case.

64.     Certain Taxing and Regulatory Authorities require the Debtor to collect from its customers, and/or for the Debtor to pay as a customer, Sales and Use Taxes that are based on a percentage of sales prices.  In most cases, the Sales and Use Taxes are paid in arrears once collected.  It is difficult for the Debtor to estimate the amount of Sales and Use Taxes owed as of the Petition Date, as such taxes are taken into account in the numerous invoices either generated by or paid by the Debtor.  The Debtor anticipates that approximately $35,000.00 in federal excise and Lust Taxes and $5,000.00 in Sale and Use Taxes will come due within the first two weeks of the bankruptcy case.  The Debtor also anticipates that certain Other Taxes will come due during the first 21 days of this Case, including, without limitation, diesel taxes in the approximate amount of $160,000.00, natural gas taxes in the approximate amount of $139,000.00, crude oil taxes in the approximate amount of $20,000.00, and delivery Fees of about $6,000.00.  These figures are approximate estimations of the amounts that will need to be paid.  The amount actually collected by the Debtor and remitted to the approximate taxing authority may differ slightly from these estimations. The Debtor seeks authority to pay such Taxes and Fees through the Tax Motion.

65.     Property Taxes are assessed and become payable in the ordinary course of business and are calculated based on a statutorily-mandated percentage of property value (for both real and personal property).  Generally, Property Taxes are due annually, and the timing of payment of Property Taxes varies from jurisdiction to jurisdiction. As of the Petition Date, no Property Tax amounts are due and owing to the Taxing and Regulatory Authorities, because the Debtor has made its first installment payment for current Property Taxes that have been assessed. The second installment payment is due in June, 2010.  Therefore, certain Property Taxes may be billed during the pendency of this Case.

2863854.3

66.     In addition, the Debtor has Franchise Tax obligations they must pay in Texas. The Franchise Taxes are assessed annually and are necessary to remain in good standing. The Debtor requests authority upon final hearing, in an abundance of caution, to continue to pay the Franchise Tax obligations if and when they become due and payable during the pendency of this Case.

67.     The Debtor remits leaking underground storage tax on all sales of diesel and on certain aviation grade Kerosene and files a return for Lust paid on sales to the United States Government, a tax exempt entity. Because the payment of Lust is directly related to the Debtor's ability to continue the sale of diesel and aviation grade Kerosene to the U. S. government and other customers, payment of Lust Taxes payment is critical to the Debtor's continued operations. The Debtor believes that it is current on this obligation.

68.     Certain of the Taxes or Fees collected by the Debtor from third parties are held in trust for the benefit of the Taxing and Regulatory Authorities. Thus, as to accrued Taxes and Fees of the Debtor that were unpaid as of the Petition Date, the Debtor's officers and directors could be subjected to lawsuits during the pendency of this Case. Such lawsuits would prove extremely distracting for the Debtor and the named officers and directors, whose immediate and full-time attention is required for the Debtor's reorganization. It is in the best interest of the Debtor's estates to eliminate the possibility of such time-consuming and potentially damaging distractions.

69.     The Debtor submits that the payment of the Taxes and Fees is necessary to avoid potential administrative difficulties. Without such payments, the Taxing and Regulatory Authorities may file liens, conduct audits and bring motions to lift the automatic stay. The Debtor believes that the payment of the Taxes and Fees will help to avoid such actions.

2863854.3

**H. Motion for Order Authorizing the Payment of Prepetition Claims to: (A) Certain Suppliers of Goods Pursuant to 11 U.S.C. §§ 503(b)(9) & 546(c); and (B) Certain Other Critical Vendors**

70.     The Debtor has also filed the *Motion for Order Authorizing the Payment of Prepetition Claims to: (A) Certain Suppliers of Goods Pursuant to 11 U.S.C. §§ 503(b)(9) & 546(c); and (B) Certain Other Critical Vendors* (the "Critical Vendor Motion").

71.     In the ordinary course of the Debtor's refining business, and as described more fully in Part I above, the Debtor purchases crude oil and related products from a number of regular suppliers. The inability of the Debtor to pay these suppliers for their prepetition shipments would cause the suppliers to withhold or delay shipments postpetition. The Debtor estimates that it owes approximately $22 million, in the aggregate, for the prepetition shipments. Most, if not all, of the shipments were delivered to the Debtor within the last 20 days. In some instances the shipments may have been delivered to the Debtor in the past 21-45 days.

72.     Additionally, the Debtor has engaged the services of certain vendors, including Black & Veatch ("B&V"), Walt Vinoski & Associates ("Walt Vinoski" and, collectively with B&V, the "Engineers"), Overland Contracting, Inc ("OCI"), Dresser Rand, Inc. ("Dresser" and, collectively with OCI, the "Contractors"),  and AGE Transport, Inc. ("AGET" and, collectively with the Engineers and the Contractors, the "Critical Vendors"). On July 20, 2009, a steam turbine generator blew up at the refinery. The Debtor hired the Engineers and the Contractors to help repair the generator. The Debtor seeks authority to pay the amounts due to the Engineers and Contractors so that they will continue their repair work on the generator. The generator is critical to the production of low sulfur diesel, one of the Debtor's key products. Attempting to use the generator in its present state could result in a hazardous build up of gases. If the Debtor does not pay the prepetition obligations of the Engineers and Contractors as they come due, those parties could potentially assert liens the property, which in turn would trigger events of default under the

Debtor's prepetition loan agreements with JPM and Chase Capital. Additionally, the Engineers and Contractors could cease their work, risking the Debtor's refining operations indefinitely and creating a hazardous situation for both the refinery and its neighbors. The Engineers and Contractors are owed approximately $2,071,045.00.

73.     AGE Transportation is the Debtor's sole transporter. Any disruption or delay in postpetition crude shipments and critical services would severely hinder the Debtor's refining operations, cash flow and ability to reorganize successfully. Thus, it is critical to Debtor's operations that AGE Transportation is paid, so that it will continue to transport for the Debtor. Accordingly, by the Critical Vendor Motion, the Debtor seeks an order authorizing, but not directing, the Debtor to pay certain suppliers for their prepetition shipments to the extent the Debtor determines, in its business judgment, that any nonpayment of prepetition shipments would cause a delay in the Debtor's postpetition operations. Such payments will comply with any budget approved by the Prepetition Lenders and this Court.

**I.     Application for Approval of the Employment of Other Professionals**

74.     While not filed with other First Day Motions, the Debtor has retained and intends to seek approval of the employment of FTI Consulting, Inc. ("FTI") and Muse, Stancil & Co. ("Muse"). The Debtor has engaged FTI to act as the Chief Restructuring Officer in connection with this Case. The Debtor has also engaged Muse to provide technical consulting to ensure a smooth transition of the Debtor's refining operations during the course of this Case. The Debtor will provide additional information consistent with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules through the respective applications to employ FTI and Muse.

[*Remainder of this page intentionally left blank; signature page will follow*]

2863854.3

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___8th___ day of February 2010.

_Lisa Trefger_
Lisa Trefger
Director of Business Administration and
Regulatory Affairs