IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| Bosque Power Company, LLC, *et al.*,[1] | ) Case No. 10-60348 |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL OF EXISTING SECURED LENDERS AND GRANTING
ADEQUATE PROTECTION FOR USE AND (B) PRESCRIBING FORM AND
MANNER OF NOTICE AND SETTING THE TIME FOR THE FINAL HEARING**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move this Court, pursuant to this emergency motion (the "Motion"), for the entry of an interim order substantially in the form submitted herewith (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "Cash Collateral Orders"), pursuant to sections 105, 361 and 363 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code"), rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the "Comments to Cash Collateral and DIP Financing Checklist" incorporated into the Local Rules of Bankruptcy Practice and Procedure (the "Local Rules") of the United States Bankruptcy Court for the Western District of Texas (the "Court"), (a) authorizing the Debtors to use the cash collateral of existing secured lenders and granting adequate protection to existing secured lenders for such use and (b) prescribing the form and manner of notice and setting the time for the final hearing on the Motion (the "Final Hearing").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BosPower Development LLC (3544); BosPower Partners LLC (6652); Bosque Power Company, LLC (8730); BosPower Development Blocker I Inc. (1043); BosPower Development Blocker II Inc. (1097); Fulcrum Marketing and Trade LLC (8911).

The facts and circumstances supporting this Motion are set forth in the Declaration of Brian R. McCabe, President of Debtors BosPower Development LLC ("BPD"), BosPower Development Blocker I Inc. ("BDBI"), BosPower Development Blocker II Inc. ("BDBII") and BosPower Partners LLC ("Partners") and an Authorized Representative of Debtors Bosque Power Company, LLC ("BPC") and Fulcrum Marketing and Trade LLC ("FMT") (the "McCabe Declaration"), filed concurrently herewith. In further support of this Motion, the Debtors respectfully represent as follows:

### Bankruptcy Rule 4001 Concise Statement

1. The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i) – (iv) are set forth at the following sections of the Interim Order:

   a. *Name of Each Entity with Interest in Cash Collateral*. [Interim Order ¶¶ G, J].

   b. *Purposes of Use of Cash Collateral*. [Interim Order ¶¶ M, 4, 5].

   c. *Duration of Use of Cash Collateral*. [Interim Order ¶ 6].

   d. *Liens, Cash Payments or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral*. [Interim Order ¶¶ 7-10].

### Jurisdiction

2. This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.

3. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

4. Venue of these chapter 11 cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

5. The statutory and rule-based predicates for the relief sought herein are sections 105, 361 and 363 of the Bankruptcy Code, rules 4001 and 6006 of the Bankruptcy Rules and the "Comments to Cash Collateral and DIP Financing Checklist" incorporated into the Local Rules of the Court.

**Background**

6. On the date hereof (the "Petition Date"), each of the Debtors filed with the Court a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing these cases (the "Chapter 11 Cases"). The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date of the filing of this Motion, no official committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of these Chapter 11 Cases.

7. The factual background relating to the Debtors' commencement of these Chapter 11 Cases and the Debtors business operations and assets is set forth in detail in the McCabe Declaration incorporated herein by reference. In summary, the Debtors are in the business of power generation and related power supply and trading. Their primary asset consists of a 802-megawatt generation facility located in Laguna Park, Bosque County, Texas.

**Prepetition Credit Agreement**

8. Debtor BPC is party to a Credit Agreement dated as of January 16, 2008 (the "Prepetition Credit Agreement") with Credit Suisse, Cayman Islands Branch, as administrative agent (the "Prepetition Agent"), and certain lender parties (collectively, the "Prepetition Senior Lenders"), pursuant to which the Prepetition Senior Lenders extended to the Debtors: (a) a senior secured term loan in the original principal amount of $387,500,000 (the "Prepetition Term Loan"), of which up to $203,000,000 was to be available for construction-related expenses (the "Prepetition Construction Sub-Amount") and up to $65,000,000 was to be available to cash collateralize letters of credit through related letter of credit facilities (the "Prepetition Deposit

3

L/C Sub-Amount"); and (b) a senior secured revolving credit facility (the "Prepetition Revolver") in the original committed amount of $25,000,000 (where applicable, the Prepetition Term Loan and Prepetition Revolver are hereinafter collectively referred to as the "Prepetition Credit Facility").

9. The Prepetition Agent and Prepetition Senior Lenders assert that the Prepetition Credit Facility is secured by first-priority liens on and security interests in substantially all of BPC's real and personal property (collectively, the "Prepetition Collateral").

10. As of the Petition Date, BPC was obligated under the Prepetition Credit Facility in the approximate aggregate principal amount of $408,302,500, of which approximately $383,302,500 is outstanding principal on account of the Prepetition Term Loan and approximately $25,000,000 is outstanding principal on account of the Prepetition Revolver.

11. Pursuant to the terms of the Prepetition Credit Agreement, the Debtors were authorized to enter into a letter of credit facility, secured by cash collateral in an amount up to the Prepetition Deposit L/C Sub-Amount, and one or more interest rate and power hedge agreements, secured by first-priority liens on the Prepetition Collateral (liens *pari passu* with those granted by the Debtors to the Prepetition Agent for the benefit of itself and the Prepetition Senior Lenders), subject to the terms and conditions of the Prepetition Intercreditor Agreement (defined below).

## Letter of Credit Facility

12. Debtor BPC is party to certain letter of credit applications and agreements (collectively, the "Prepetition Letter of Credit Facility") with JPMorgan Chase Bank, N.A. ("JPM" and, collectively, with the Prepetition Agent, the Prepetition Senior Lenders, the lender parties to the Prepetition Intercreditor Agreement (as defined below), the secured parties under

the Commodity Hedge Agreements (as defined below) and the secured parties under the Interest Rate Hedge Agreements (as defined below), the "Prepetition Secured Lenders"), pursuant to which JPM agreed to issue for the account of Debtor BPC one or more standby or commercial letters of credit (the "JPM Letters of Credit"). As of the Petition Date, four JPM Letters of Credit in the aggregate amount of $48,500,000 remain outstanding, which JPM Letters of Credit are fully secured by cash collateral (invested in certificates of deposit) at JPM (and with respect to which Debtor BPC executed various Assignments of Deposit Account).

## Collateral Agency and Intercreditor Agreement

13. Debtors BPC and Partners are grantors under a Collateral Agency and Intercreditor Agreement dated as of January 16, 2008 (the "Prepetition Intercreditor Agreement") with the Prepetition Agent, as collateral agent (the "Prepetition Collateral Agent") for the Secured Parties (as defined in the Prepetition Intercreditor Agreement) and as Prepetition Agent under the Prepetition Credit Agreement, and the debt representatives from time to time party to the Prepetition Intercreditor Agreement, pursuant to which (given that the Prepetition Collateral secures the Debtors' obligations under both the Prepetition Credit Agreement (described above) and the hedge agreements (described below)) the Prepetition Collateral Agent agreed to act on behalf of all secured parties with respect to the Prepetition Collateral and entered into the Prepetition Intercreditor Agreement to, among other things, define the rights, duties, authority and responsibilities of the Prepetition Collateral Agent and the relationships among the Secured Parties (as defined in the Prepetition Intercreditor Agreement) regarding their respective interests in the Prepetition Collateral.

## Secured Hedge Agreements

14. Debtors BPC and FMT are parties to an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement dated as of October 23, 2008 (including each confirmation entered into pursuant to such ISDA Master Agreement, the "Commodity Hedge Agreements"), pursuant to which BPC and FMT entered into one or more hedging transactions. Under the Commodity Hedge Agreements, FMT is required to maintain letter of credit support for its payment obligations to BPC. On June 1, 2009, pursuant to separate letter of credit reimbursement agreements, Credit Suisse, Cayman Islands Branch, as issuing bank, issued two letters of credit for the account of FMT: (a) a letter of credit in the amount of $10,000,000 (as amended, the "Cash Collateralized LC"), which was fully drawn prior to the Petition Date; and (ii) a letter of credit in the amount of $12,150,000 (as amended, the "Securities Collateralized LC"), which is secured by a pledge of the equity interests by Debtors BPD, BDBI and BDBII in Partners and supported by the Commitment Letter dated June 1, 2009, between Arcapita Bank B.S.C.(c) ("Arcapita") and FMT. The amount available for drawing under the Securities Collateralized LC automatically decreases each month in accordance with a schedule. As of the Petition Date, Debtor FMT is current on its reimbursement obligations owing to Debtor BPC.

15. Debtor BPC and Credit Suisse, Cayman Islands Branch, as swap provider (the "Prepetition Swap Provider"), are parties to an ISDA Master Agreement dated as of January 16, 2008 (including each confirmation entered into pursuant to such ISDA Master Agreement, the "Interest Rate Hedge Agreements"), pursuant to which BPC and the Prepetition Swap Provider entered into one or more interest rate hedging transactions to protect Debtor BPC from fluctuations in interest rates. Debtor BPC's obligations to the Prepetition Swap Provider under the Interest Rate Hedge Agreements are secured by first-priority liens on the Prepetition Collateral (liens *pari passu* with those granted by the Debtors to the Prepetition Agent for the

benefit of itself and the Prepetition Senior Lenders), subject to the terms and conditions of the Prepetition Intercreditor Agreement. Assuming that the swaps are terminated as of December 31, 2009, the termination value owed by Debtor BPC to the Prepetition Swap Provider under the Interest Rate Hedge Agreements is approximately $5,296,081.

### M&M Liens

16. As of the Petition Date, certain parties may hold mechanics and materialmen's liens (the "M&M Liens") on certain of the Debtors' assets. To the extent that such M&M Liens are valid, enforceable, non-avoidable, perfected and attached to property of the Debtors, such M&M Liens shall remain unaffected by this Motion.

17. Not unlike nearly every other asset and business in the United States, the Debtors' assets and going concern value are worth less today than they were in early 2008, when the Debtors entered into the Prepetition Credit Agreement. These Chapter 11 Cases principally are balance sheet, and not operational, restructuring cases. The Debtors operate at a profit. In 2009, the Debtors generated approximately $6 million in earnings before interest, taxes, depreciation and amortization ("EBITDA"). The Debtors project positive EBITDA for 2010 in excess of $9 million. The Debtors intend to use Cash Collateral to operate their business while they explore various restructuring alternatives.

### Relief Requested

18. By this Motion, pursuant to sections 105, 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, the Debtors request that the Court grant the following relief as provided for in the Interim Order and the Final Order:

>   a. authorize the Debtors on an interim basis, pursuant to section 363(c) of the Bankruptcy Code, to use proceeds of assets on which the Prepetition Secured

Lenders assert first-priority liens and security interests (the "Cash Collateral")[2] in accordance with the budget (as amended from time to time, the "Budget") attached to the Interim Order as Exhibit 1;

b. authorize the Debtors on an interim basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Lenders with respect to any diminution in value of the Prepetition Secured Lenders' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral;

c. schedule the Final Hearing, pursuant to Bankruptcy Rule 4001 to consider entry of a Final Order authorizing the use of Cash Collateral and approving the notice procedures in respect of the Final Hearing;

d. authorize the Debtors on a final basis, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral in accordance with the Budget and any supplemental Budgets as approved by the Court after further notice and hearing;

e. authorize the Debtors on a final basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Lenders with respect to any diminution in value of the Prepetition Secured Lenders' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral.

**Basis for Relief**

**A. The Debtors Have an Immediate Need for Use of Cash Collateral.**

---

[2] The Debtors do not hereby make any admission with respect to the validity, priority, extent or enforceability of the liens asserted by the Prepetition Secured Lenders and hereby reserve all rights with respect thereto. In fact, the Debtors note that, under the terms of the Depositary Agreement dated as of January 16, 2008 (the "Depositary Agreement"), among Debtor BPC, as borrower, the Prepetition Collateral Agent, as collateral agent, and JPM, as depositary bank, certain cash being held on the Petition Date by JPM in certificates of deposit in amounts in excess of those necessary to fully cash collateralize the JPM Letters of Credit, are not "Accounts" in which the Prepetition Collateral Agent was granted a security interest (*i.e.*, "any cash collateral account established in connection with any Related LC Facility" was expressly carved out from the definition of "Accounts" and not pledged to the Prepetition Collateral Agent under the Depositary Agreement). Therefore, given that the Prepetition Collateral Agent does not have a security interest in the cash being held in the Debtors' certificates of deposit at JPM and such cash, as JPM Letters of Credit expire on a rolling basis, is in excess of that properly held by JPM to secure Debtor BPC's obligations under the JPM Letters of Credit (the "Excess Cash"), these amounts may not constitute the Prepetition Secured Lenders' "Cash Collateral." That notwithstanding, out of an abundance of caution, the Debtors are seeking the authority requested herein. The amount of such "Excess Cash" being held by JPM as of the Petition Date is approximately $11,183,000. The Debtors intend to open at JPM a new debtor-in-possession account into which the Debtors will deposit Excess Cash. The Debtors intend to fund negative cash flow, in amounts set forth in any approved Budget, with such Excess Cash. The Debtors and the Prepetition Secured Lenders reserve all of their respective rights with regard to an ultimate determination by this Court, should such a determination become necessary, of (a) whether the Excess Cash is subject to a valid, perfected, enforceable prepetition lien in favor of the Prepetition Collateral Agent and, as such, constitutes cash collateral; and (b) whether proceeds of the Excess Cash are proceeds of non-cash collateral (and therefore, unencumbered) or proceeds of the cash collateral (and therefore, encumbered).

19. The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion. Accordingly, the Debtors seek to use Cash Collateral existing on or after the Petition Date that may be subject to the Prepetition Secured Lenders' liens. As of the Petition Date, the Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.

20. Absent the ability to use Cash Collateral, the Debtors will not be able to pay insurance, contractual obligations, utility charges and other critical operating expenses. Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and continue their restructuring efforts and would likely be forced to cease operations and liquidate. Accordingly, the Debtors' estates would be immediately and irreparably harmed.

21. If the Debtors are unable to obtain sufficient operating liquidity to meet their postpetition obligations on a timely basis, a permanent and irreplaceable loss of business will occur, causing a loss of value to the detriment of the Debtors and their creditors. This potential loss of revenue and going concern value would be extremely harmful to the Debtors, their estates and their creditors at this critical juncture.

22. Any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business. Such a lapse could lead to, among other negative consequences: (a) an inability of the Debtors to continue making improvements to the facility, which improvements will permit the Debtors to increase power output capacity during the lucrative summer months quickly approaching; (b) a payment default under the Debtors' Operation and Management Agreement (the "O&M Agreement") with Wood Group Power Operations (West) Inc. ("Wood Group"), which would permit Wood Group to

terminate the O&M Agreement, thus terminating the Wood Group employees who operate the Debtors' facility (who, in turn, may find employment at other facilities in the area searching for experienced operators); (c) a need to find, hire and train persons to operate and maintain the Debtors' facility; (d) a payment default under the Energy Management Agreement (the "EMA") with EDF Trading North America, LLC ("EDF"), which would permit EDF to terminate the EMA, and, if the Debtors' operations were to restart, EDF or another energy manager would likely require enhanced credit support from the Debtors to cover the risk of non-payment of lost variable profit from lost gross margin from the Debtors; (e) a payment default under the Long Term Service Agreements (the "LTSAs") with General Electric International, Inc. ("GE"), which would permit GE to terminate the LTSAs (therefore, assuming that the LTSAs are better priced than current market conditions, GE's termination thereof would cause the Debtors to incur potentially substantial additional costs in entering into, or enticing GE to enter into amended, LTSAs); and (f) the Debtors' inability to procure consumables, spare and replacement parts and services without prepaying. The Debtors estimate that, in the event that even some of these contingencies were to materialize, restarting the Debtors' power operations following a lapse could cost tens of millions of dollars.

23. The Debtors cannot obtain funds sufficient to administer their estates and operate their business other than by obtaining the relief requested herein pursuant to section 363 of the Bankruptcy Code. Accordingly, the Debtors' management has formulated the Budget for the use of Cash Collateral from the Petition Date through three (3) weeks hereafter. The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their business and their restructuring efforts for the period set forth in the Budget. The Debtors also believe that the use of Cash Collateral in

accordance with the Budget will provide the Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

24. The Debtors' propose that their right to use Cash Collateral under the Interim Order shall commence on the date of the entry of the Interim Order and expire on the earlier of (a) the entry of a subsequent interim order or (b) the entry of the Final Order.

**B.     The Interests of the Prepetition Secured Lenders Are Adequately Protected.**

25. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with the consent of the secured party with an interest therein or court approval. 11 U.S.C. § 362(c)(2). Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in cash collateral sought to be used by a debtor, the court shall prohibit or condition such use of cash collateral as is necessary to provide adequate protection of such entity's interest. 11 U.S.C. § 362(e).

26. The purpose of adequate protection under section 361 of the Bankruptcy Code is to protect a secured creditor from diminution in the value of its interest in the collateral at issue during the period of the use of such collateral. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1389 (5th Cir. 1986) (adequate protection is intended to protect secured creditors from a decrease in value of their collateral); *Thomas Jefferson Const. Co., Inc. v. Martinez*, 1997 WL 375880, *2 (E.D. La. 1997) (adequate protection provisions of the Bankruptcy Code were intended to protect a secured creditor against a decrease in value of its collateral); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (creditor should receive adequate protection only where there is a decrease in value of the collateral). Here, the Debtors are requesting authority to use

Cash Collateral to protect the enterprise value of the Debtors' business (including the value of the Prepetition Collateral), to keep the product supplied by the Debtors in the energy marketplace and to be "online" and providing electricity to the marketplace during the upcoming lucrative summer months.

27. Whether or not a creditor is adequately protected is determined on a case-by-case basis. *See In re Self*, 239 B.R. 877, 881 (Bankr. N.D. Tex. 1999) (determination of adequate protection is not an "exact science" but, rather, it requires a court to balance all relevant factors); *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987) (stating that the concept of adequate protection is a flexible one and that courts should determine whether it exists on a case-by-case basis); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (stating that adequate protection is determined on a case-by-case basis).

28. The Debtors assert that the Prepetition Secured Lenders and the and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are adequately protected by the granting of replacement liens (only to the extent that their prepetition security interests are valid, perfected and enforceable), the continued operation of the Debtors' power plant, the completion of ongoing maintenance at the plant and the completion of the conversion of two simple-cycle combustion turbines to combined-cycle configuration with a capacity of over 800 megawatts (the "Conversion").

*Replacement Liens*

29. As adequate protection for any diminution in value of the Prepetition Secured Lenders' interests or the interests of the holders of valid, enforceable, non-avoidable, perfected M&M Liens, the Debtors request that the Court grant the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens security interests

("Replacement Liens"), equivalent to liens granted under section 364(c)(2) and (3) of the Bankruptcy Code, as applicable, in and upon the Debtors' real and personal property and the Cash Collateral, whether such property was acquired before or after the Petition Date (collectively, the "Collateral"), to the extent: (a) that the Prepetition Secured Lenders' prepetition security interests in the Prepetition Collateral are valid, perfected and enforceable; and (b) of the amount of any diminution in value of the Prepetition Secured Lenders' Prepetition Collateral. If granted, the Replacement Liens will adequately protect the Prepetition Secured Lenders' interests and the interests of and the holders of valid, enforceable, non-avoidable, perfected M&M Liens from any potential depreciation and deterioration. The Replacement Liens shall be of the same validity and priority as the liens of the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens on the Prepetition Collateral.

*Continued Operation of the Debtors' Business*

30. In addition to the proposed Replacement Liens, the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are also adequately protected as a result of the continuation of the Debtors' business operations. Without the use of the Cash Collateral, the Debtors would forego business opportunities (including preparing the facility to be fully operational for the lucrative summer months) and their operations would be irreparably harmed, with a consequential decrease in the value of the Debtors' business and the value of the Collateral. Indeed, absent use of the Cash Collateral, the Debtors will be unable to pay their ordinary business expenses, including, among others, the wages of the Wood Group's employees who operate the Debtors' facility, ongoing maintenance and completion of the Conversion. In that event, all operations may cease – the Wood Group's employees will be

terminated, the Debtors' facility will close and all assets on which the Prepetition Secured Lenders assert a lien will sit idle, without any kind of protective services. Those pledged assets (including accounts receivable, machinery and equipment and real property) will be worth less if the facility closes than they are worth now and will be worth when the maintenance and Conversion are completed. Given that the Debtors have generated positive EBITDA in the past and project positive EBITDA for the future, use of Cash Collateral to operate the business and maintain going concern value provides adequate protection to the Prepetition Secured Lenders. As current going concern value exceeds liquidation value, and the expected value upon completion of maintenance and the Conversion will exceed current value by more than the amount of Cash Collateral sought to be used, adequate protection is being provided. The Prepetition Secured Lenders are receiving Replacement Liens in that cash to adequately protect them against the Debtors' use of approximately $1,178,000 for the next three weeks. As reflected in the Budget, the Prepetition Secured Lenders' cash position will improve over the course of that period by approximately $139,000 (*i.e.*, beginning cash collateral as of March 24, 2010 is approximately $1.1 million and the Debtors project that ending cash collateral as of April 9, 2010 will be $1.24 million).

31. The continuation of the Debtors' operations likely presents the best opportunity for the Prepetition Secured Lenders to receive the greatest recovery on account of their claims. Accordingly, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and thereby protect the Prepetition Secured Lenders' interests. Courts have recognized that the preservation of the going concern value of a secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is

no actual diminution of value of collateral and the debtor can operate profitably post-petition, then the secured creditor is adequately protected); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).

32.     In summary, the Debtors submit that the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are adequately protected by the proposed Replacement Liens in the Collateral and by maintaining the business of the Debtors as a going concern, completing current maintenance on the facility, completing the Conversion, and thereby (a) having a fully-operational power plant by the start of the key summer season, and (b) otherwise preventing diminution in the overall value of the Prepetition Collateral.

**C.      Interim Approval Should Be Granted.**

33.     The Debtors respectfully request that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtors (from and after the entry of the Interim Order and pending the Final Hearing) to use the Cash Collateral in accordance with the Budget for, among other things, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court.  Interim access to the Cash Collateral will

ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

34. The Debtors submit that, for the reasons set forth herein, immediate access to the use of Cash Collateral (first, on an interim basis as requested in this Motion), on the terms set forth in the Budget, is necessary to preserve the value of the Debtors' estates for the benefit of all parties in interest.

**D.     Request for a Final Hearing**

35. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Notice**

36. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is authorized to conduct a preliminary expedited hearing in the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. Such relief is routinely granted in chapter 11 cases in this and other districts.

37. Notice of this Motion has been given to: (a) the United States Trustee; (b) the Prepetition Agent; (c) counsel for the Prepetition Agent; (d) the Debtors' thirty largest unsecured creditors as set forth in the consolidated list filed with the Debtors' petitions; and (e) all required governmental agencies. The Debtors submit that such notice is sufficient and adequate pursuant to Bankruptcy Rules 2002, 4001, 9006 and 9014 and as required by sections 102(1) and 363 of

the Bankruptcy Code. The Debtors believe that no further notice of, or hearing on, the relief sought in this Motion is necessary or required.

38. In light of the nature of the relief requested herein, the Debtors respectfully submit that the Court may enter the Interim Order granting the relief requested without further notice. Shortened notice, particularly of the interim relief requested herein, is appropriate given the Debtors' urgent need to use the Cash Collateral. Such notice complies with section 102(1) of the Bankruptcy Code. The Final Hearing on the relief requested herein should be set upon at least fifteen (15) days notice as required by Bankruptcy Rule 4001(b)(2), consistent with a timetable to allow the Debtors' operations to continue. The Debtors shall serve notice of the Final Hearing upon the parties identified in the preceding paragraph as well as: (a) parties requesting notice under Bankruptcy Rule 2002; (b) other secured creditors and parties in interest identified as having an interest in the relief requested herein, if any; (c) any appointed committees; and (d) any other parties otherwise entitled to notice of the proceedings initiated herein.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court: (a) enter an order substantially in the form submitted herewith, granting the relief sought herein; and (b) grant to the Debtors such other and further relief as the Court may deem proper.

*[Remainder of page intentionally left blank]*

Dated: March 24, 2010
Houston, Texas

/s Jeff J. Marwil
**PROSKAUER ROSE LLP**
Jeff J. Marwil (*pro hac vice* application pending)
Peter J. Young (*pro hac vice* application pending)
Grayson T. Walter (*pro hac vice* application pending)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Facsimile: (312) 962-3551
*Proposed Counsel for the Debtors and Debtors in Possession*

*-and-*

**KING & SPALDING LLP**
Henry J. Kaim
State Bar No. 11075400
Edward L. Ripley
State Bar no. 16935950
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
*Proposed Special Counsel for Debtors and Debtors in Possession*