**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Bosque Power Company, LLC, *et al.*,[1] | ) | Case No. 10-60348 |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DECLARATION OF BRIAN R. McCABE IN SUPPORT OF FIRST DAY PLEADINGS

I, Brian R. McCabe, hereby declare under penalty of perjury:

1.      I am the President of Debtors BosPower Development LLC ("BPD"), BosPower Development Blocker I Inc. ("BDBI"), BosPower Development Blocker II Inc. ("BDBII") and BosPower Partners LLC ("Partners") and an Authorized Representative of Debtors Bosque Power Company, LLC ("BPC") and Fulcrum Marketing and Trade LLC ("FMT").   In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records and am authorized to submit this declaration.

2.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested various types of relief in their "first day" pleadings and applications (each, a "First Day Pleading").   The First Day Pleadings seek relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.   I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BosPower Development LLC (3544); BosPower Partners LLC (6652); Bosque Power Company, LLC (8730); BosPower Development Blocker I Inc. (1043); BosPower Development Blocker II Inc. (1097); Fulcrum Marketing and Trade LLC (8911).

1130/15973-001 Current/18289620v1
1123/15761-001 Current/15628322v1

Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful restructuring of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

3.       Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.       This Declaration (a) describes the Debtors' businesses, their capital and corporate structures and the circumstances surrounding the commencement of these chapter 11 cases, and (b) sets forth the relevant facts in support of each of the First Day Pleadings.[1]

## Background

### A.       Commencement of the Chapter 11 Cases

5.       On the date hereof (the "Petition Date"), Bosque Power Company, LLC and five of its affiliates each filed a voluntary petition for relief under title 11 of the United States Code (11 U.S.C. §§ 101–1532, as amended, the "Bankruptcy Code"), commencing the Debtors' chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and, as of the date hereof, no official committees have been appointed or

---

[1] Each capitalized term used but not otherwise defined herein shall have the meaning ascribed thereto in the relevant First Day Pleading.

designated.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

**B.      The Debtors' Business**

6.      The Debtors own and operate a natural gas fired power plant (the "<u>Power Plant</u>" or the "<u>Facility</u>") located in Laguna Park, Texas, which, since commencing operations in 2000, sells its energy and ancillary services into the Texas power market.  The plant includes three simple-cycle combustion turbines, two of which the Debtors are in the process of converting to combined-cycle configuration with a capacity of over 800 megawatts (the "<u>Conversion</u>").

7.      The Debtors are managed and operated pursuant to contractual relationships with three service providers:  PurEnergy Management Services, LLC ("<u>PurEnergy</u>"), EDF Trading North America, LLC ("<u>EDF</u>") and Wood Group Power Operations (West), Inc. ("<u>Wood Group</u>").

8.      Pursuant to the terms of that certain Management Services Agreement dated January 4, 2010 among Debtor BosPower Partners, LLC, Debtor Bosque Power Company, LLC, and PurEnergy, PurEnergy provides project management, construction management, operations management and administrative services for the plant.  PurEnergy currently manages and/or operates a portfolio of seventeen power generation plants, totaling over 2,300 megawatts throughout the United States.

9.      EDF is the Debtors' qualified scheduling entity (QSE) and the commercial interface between sellers of gas, buyers of electricity and the Electric Reliability Council of Texas ("<u>ERCOT</u>").  ERCOT, as the independent system operator, buys ancillary services and real-time energy from EDF and, in turn, EDF buys it from the Debtors.  EDF is a leader in the

international wholesale energy markets, engaging in both wholesale gas and wholesale power trading and supply.

10.     Wood Group operates and maintains the Debtors' Facility through the deployment of twenty-seven employees (the "Wood Group Employees"), some of whom are part-time hourly employees and some of whom are full-time salaried employees.  Specifically, the Wood Group Employees, upon their receipt of dispatch orders from EDF, turn on the Debtors' Facility to burn natural gas and generate electricity at the electric interconnection point.

**C.      The Debtors' Corporate Structure**

11.     The Debtors' corporate structure is not complicated.    Non-Debtor GSS (BosPower Development) Inc. owns 100% of the membership interests in BosPower Development LLC, which, in turn, owns 100% of the common stock of Debtors BosPower Development Blocker I Inc. and BosPower Development Blocker II Inc. and 58.82% of the Class A units (common), 100% of the Class B units (preferred) and 97.85% of the Class C units (preferred) in Debtor BosPower Partners LLC.   Debtor BosPower Development Blocker I Inc. owns 18.19% of the Class A units (common), and BosPower Development Blocker II Inc. owns 20.84% of the Class A units (common), of Debtor BosPower Partners LLC.   BosPower Partners LLC owns 100% of the membership interests in Debtor Bosque Power Company LLC and Debtor Fulcrum Marketing and Trade LLC.   An organization chart is attached hereto as **Exhibit A**.

**D.      The Debtors' Capital Structure**

12.     The Debtors' capital structure is also not complicated.   Debtor Bosque Power Company, LLC is party to a Credit Agreement dated as of January 16, 2008 (the "Prepetition Credit Agreement") with Credit Suisse, Cayman Islands Branch, as administrative agent (the

"Prepetition Agent"), and certain lender parties (collectively, the "Prepetition Senior Lenders"), pursuant to which the Prepetition Senior Lenders extended to the Debtors: (a) a senior secured term loan in the original principal amount of $387,500,000 (the "Prepetition Term Loan"), of which up to $203,000,000 was to be available for construction-related expenses (the "Prepetition Construction Sub-Amount") and up to $65,000,000 was to be available to cash collateralize letters of credit through related letter of credit facilities (the "Prepetition Deposit L/C Sub-Amount"); and (b) a senior secured revolving credit facility (the "Prepetition Revolver") in the original committed amount of $25,000,000 (where applicable, the Prepetition Term Loan and Prepetition Revolver are hereinafter collectively referred to as the "Prepetition Credit Facility"), of which an aggregate principal amount of approximately $408,302,500 remains outstanding as of the Petition Date.

13.     Pursuant to a Security Agreement (the "Prepetition Security Agreement"), Debtors Bosque Power Company, LLC and BosPower Partners LLC granted to the Prepetition Agent, as collateral agent (the "Prepetition Collateral Agent"), for the benefit of the Petition Senior Lenders, security interests in and liens upon substantially all of the Debtors' assets (the "Prepetition Collateral"), including the Debtors' cash and cash equivalents (the "Cash Collateral").

14.     Debtors Bosque Power Company, LLC and BosPower Partners LLC are grantors under a Collateral Agency and Intercreditor Agreement dated as of January 16, 2008 (the "Prepetition Intercreditor Agreement") with the Prepetition Collateral Agent for the Secured Parties (as defined in the Prepetition Intercreditor Agreement) and as Prepetition Agent under the Prepetition Credit Agreement, and the debt representatives from time to time party to the Prepetition Intercreditor Agreement. Under the terms of the Prepetition Intercreditor Agreement,

the Prepetition Collateral secures the Debtors' obligations under both the Prepetition Credit Agreement (described above) and certain secured hedge agreements.

**E.  Events Leading to the Commencement of the Chapter 11 Cases**

15.    In 2009, the Debtors generated approximately $6 million in earnings before interest, taxes, depreciation and amortization ("EBITDA").  The Debtors' financial performance was adversely impacted by the ongoing Conversion completion delays, exacerbated by depressed energy prices in the ERCOT region.  The Debtors construction efforts are currently focused on completing the Conversion in advance of the upcoming lucrative summer months.  In the meantime, the Debtors continue to operate their simple-cycle combustion turbine, keeping the product supplied by the Debtors in the energy marketplace and remaining "online" and ready to provide electricity.  Pending completion of the Conversion, revenues currently being generated by the Debtors are primarily from ancillary services and operation of the simple-cycle combustion turbine.

16.    Although the Debtors project the gross margin will increase moderately over the next several years, given the current market outlook and cash flow forecast, the Debtors cannot support their existing capital structure.  Thus, these Chapter 11 Cases principally are balance sheet, and not operational, restructuring cases.  The Debtors have generated and expect to continue to generate positive EBITDA.  These cases were not filed due to pressure from the Debtors' ongoing, general unsecured trade creditors.  In fact, the Debtors are current on all of their general unsecured trade obligations and have paid those claims within ordinary course of business trade terms.

17.    In connection with the Debtors' recent replacement of their former asset and energy manager, Fulcrum Power Services, with PurEnergy, as asset manager, and EDF, as

energy manager, the Debtors have an opportunity (and an ability to take advantage of EDF's position in the marketplace) to reduce substantially letter of credit facilities with JPMorgan Chase, N.A. ("JPM"), which historically have served to support the Debtors' operations, primarily their gas purchases. The facility at JPM is 100% cash collateralized. With such an opportunity to reduce letter of credit needs going forward, and letters of credit expiring on a rolling basis, JPM will release cash collateral. Subject to the Court's approval, the Debtors are seeking to use some of this "excess" cash to fund their liquidity needs in chapter 11. For these reasons, the Debtors are seeking to use cash collateral, but do not need debtor-in-possession financing.

18.     The Debtors are currently in covenant default under the Prepetition Credit Facility.

**F.      Prepetition Negotiations with the Prepetition Senior Lenders**

19.     The Debtors have determined that restructuring their balance sheet is in the best interest of their business and constituents. Leading up to the Petition Date, the Debtors attempted to reach agreement on a consensual out-of-court restructuring with the Prepetition Senior Lenders, and presented to the Prepetition Senior Lenders a proposal for such a restructuring, but despite the Debtors' good faith efforts, were not able to do so. The Debtors filed the Chapter 11 Cases in order to preserve the value of the Debtors' business and their ability to pursue various reorganization and restructuring options and to forestall potential detrimental enforcement actions by the Debtors' Prepetition Senior Lenders.

7

**First Day Pleadings**

## I. PROCEDURAL PLEADINGS

### A. Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) (the "Joint Administration Motion")

20.     By this Motion, the Debtors seek an order directing the joint administration of these Chapter 11 Cases, for procedural purposes only.

21.     The joint administration of these Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Chapter 11 Cases and to combine notices to creditors and other parties in interest of the Debtors' respective estates.  The Debtors anticipate that numerous notices, applications, motions, and other pleadings, hearings and orders in these cases will affect all of the Debtors.

22.     Joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting parties in interest to:  (a) use a single caption on all documents that will be served and filed in the Debtors' Chapter 11 Cases; and (b) file pleadings in one case rather than in multiple cases.  Joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases.  Joint administration of these Chapter 11 Cases will ease the administrative burden for the Court and all parties in interest.

23.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases because the relief sought in this Motion is purely procedural and is in no way intended to affect substantive rights.  Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or interest.

24.     In furtherance of the foregoing, the Debtors request that the official caption to be used by all parties in all pleadings in the jointly administered cases be as follows (including footnote text included at bottom of page):

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Bosque Power Company, LLC, *et al.*,[1] | ) | Case No. 10-60348 (___) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

25.     The Debtors submit that use of this simplified caption will eliminate cumbersome and confusing procedures and ensure uniformity of pleadings.

26.     The Debtors also request that a docket entry, substantially similar to the following, be entered on the docket of each case to reflect the joint administration of these Chapter 11 Cases:

> "An order pursuant to Federal Rule of Bankruptcy Procedure 1015(b) has been entered in this case directing the joint administration of the chapter 11 cases of BosPower Development LLC (Case No. 10-60349), BosPower Partners LLC (Case No. 10-60352), Bosque Power Company, LLC (Case No. 10-60348), BosPower Development Blocker I Inc. (Case No. 10-60350), BosPower Development Blocker II Inc. (Case No. 10-60351), and Fulcrum Marketing and Trade LLC (Case No. 10-60353). The case of Bosque Power Company, LLC (Case No. 10-60348) has been designated the 'lead' case; accordingly, the docket in Case No. 10-60348 should be consulted for all matters affecting the chapter 11 case of this debtor."

27.     Finally, the Debtors seek authority to file, on a consolidating basis, the monthly operating reports required by the United State Trustee if the Debtors determine, after

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BosPower Development LLC (3544); BosPower Partners LLC (6652); Bosque Power Company, LLC (8730); BosPower Development Blocker I Inc. (1043); BosPower Development Blocker II Inc. (1097); Fulcrum Marketing and Trade LLC (8911).

1130/15973-001 Current/18289620v1

consultation with the United States Trustee, that consolidating reports would further administrative economy and efficiency without prejudice to any party in interest and that consolidating reports would accurately reflect the Debtors' business operations and financial affairs.

**B.      Debtors' Emergency Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion")**

28.      Given the size and the complexity of their business operations, the number of creditors, and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting systems, the Debtors have begun, but have not yet finished compiling the information that will be required in order to complete the Schedules and Statements. Due to the large scale of their business, the Debtors believe that they have more than 100 creditors and other parties in interest, which requires the maintenance of voluminous books and records and complex accounting systems to ensure that their operations run efficiently and cost-effectively. Completing the Schedules and Statements will require the collection, review, and assembly of information from multiple sources.

29.      Therefore, due to the complexity and diversity of their operations and the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these Chapter 11 Cases, the Debtors anticipate that they will be unable to complete their Schedules and Statements in the time required under Bankruptcy Rule 1007(c).

30.      The Debtors respectfully submit that focusing the attention of key accounting and legal personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will help the Debtors make a smooth transition into chapter 11 and, therefore, ultimately will help maximize the value of the Debtors' estates to the benefit of

creditors and all parties in interest. Nevertheless, recognizing the importance of the Schedules and Statements in these Chapter 11 Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

31. Accordingly, the Debtors seek entry of an order extending the time for the Debtors to file their Schedules and Statements for an additional thirty (30) days, without prejudice to the Debtors' ability to request additional time should it become necessary.

32. The Debtors require extra time to prepare and file their Schedules and Statements. The Debtors' business operations are complex and accurate preparation of their Schedules and Statements will require significant attention from the Debtors' personnel and advisors, which would distract attention from the Debtors' business operations at a sensitive time when the business can ill afford any disturbance. Moreover, creditors and other parties in interest will not be significantly harmed by the proposed extension of the filing deadline, because even under the extended deadline, the Schedules and Statements would be filed in advance of any planned bar date in these Chapter 11 Cases. Accordingly, the Debtors submit that their request for a thirty-day extension of time to file the Schedules and Statements is consistent with precedent and is appropriate and warranted under the circumstances.

## II. PROFESSIONAL RETENTION APPLICATION

### A. Application of Debtors for an Order Approving Agreement with Kurtzman Carson Consultants LLC and Appointing Kurtzman Carson Consultants LLC as Notice and Claims Agent (the "KCC Application")

33. By this Application, the Debtors seek to employ and retain KCC as Notice and Claims Agent.

34. The Debtors have determined to seek authority from this Court to employ KCC to perform notice and claims services for the Debtors in these Chapter 11 Cases upon the terms and conditions contained in that certain KCC Agreement for Services, dated as of March 23, 2010,

by and between KCC and the Debtors (together with all amendments, modifications, renewals thereof and all documents ancillary thereto or otherwise entered into in connection therewith, the "Services Agreement"), a copy of which is attached to the KCC Application as Exhibit A and incorporated herein by reference.

35.     As set forth in the affidavit of James Le, Chief Operating Officer of KCC (the "Le Affidavit"), which is attached to the KCC Application as Exhibit B, the Debtors have numerous potential creditors.  In addition to these creditors, there are many other parties in interest in the Debtors' Chapter 11 Cases.  Although the office of the Clerk of the United States Bankruptcy Court for the Western District of Texas (the "Clerk's Office") ordinarily would serve notices on the Debtors' creditors and other parties in interest and administer claims against the Debtors, the Clerk's Office may not have the resources to undertake such tasks, especially in light of the Debtors' creditor body and the tight timelines that frequently arise in chapter 11 cases.

36.     Because the Debtors agree that retaining KCC as Notice and Claims Agent is in the best interests of the Debtors and their estates, the Debtors propose to engage KCC to act as the Debtors' Notice and Claims Agent.  This retention is the most effective and efficient manner of providing notice to the Debtors' creditors and other parties in interest of the commencement of these Chapter 11 Cases and other developments in these Chapter 11 Cases.  In that capacity, KCC will transmit, receive, docket and maintain proofs of claims filed in connection with these Chapter 11 Cases.

37.     KCC is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, solicitation, ballot tabulation and other related services critical to the effective administration of chapter 11 cases. Indeed, KCC has developed efficient and cost-effective methods to properly handle the

voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest. Further, KCC will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures and the provisions of any orders entered by this Court.

38.     KCC has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this District and other districts nationwide.

39.     Pursuant to the Services Agreement, KCC will perform various noticing, claims management and reconciliation, plan solicitation, balloting, disbursement and other services (collectively, the "Services"), if necessary, at the request of the Debtors or the Clerk's Office. Such Services may include, for instance:

> (a)     assisting with creditor matrix compilation, relevant notice party list creation and preparation of required schedules and statements of financial affairs;
>
> (b)     creating and distributing personalized claim forms to creditors and other interested parties and providing access to the public for examination of copies of the proofs of claim or proofs of interest filed in the case and the claims register at no charge during regular business hours;
>
> (c)     receiving, examining and maintaining all proofs of claim filed with the Court, providing secure storage for all original proofs of claim;
>
> (d)     maintaining official claims registers in the Chapter 11 Cases by docketing all proofs of claim and proofs of interest in a claims database that includes the following information for each such claim or interest asserted:
>
>> i.     the name and address of the claimant or interest holder and any agent thereof, if the proof of claim or proof of interest was filed by an agent;
>>
>> ii.    the date the proof of claim or proof of interest was received by KCC and/or the Court;

<blockquote>
<blockquote>
iii.    the claim number assigned to the proof of claim or proof of interest;

iv.    the asserted amount and classification of the claim; and

v.    the applicable Debtor against which the claim or interest is asserted;
</blockquote>
</blockquote>

(e)    facilitating the claims-reconciliation process by matching filed claims to scheduled liabilities, identifying duplicate and amended claims, locating wrong-debtor or multiple-debtor claims and generating necessary reports to be used as exhibits for claims objections;

(f)    recording claim transfers and providing required notice to affected parties pursuant to Bankruptcy Rule 3001(e);

(g)    implementing necessary security measures to ensure the completeness and integrity of the claims registers;

(h)    complying with applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders and other requirements;

(i)    implementing virtual data room solutions to help expedite contract review, streamlining asset sales or facilitating legal proceedings in conjunction with the Debtors' restructuring;

(j)    preparing and serving required notices in the Chapter 11 Cases, including:

<blockquote>
<blockquote>
i.    notice of the commencement of the Chapter 11 Cases and the initial meeting of creditors under Bankruptcy Code section 341(a);

ii.    a notice of the claims bar date;

iii.    notices of objections to claims and objections to transfers of claims;

iv.    notices of hearings on motions filed by the Office of the United States Trustee for the Western District of Texas (the "U.S. Trustee");

v.    notices of transfers of claims;

vi.    notices of any hearings on a disclosure statement and confirmation of the Debtors' plan or plans of reorganization; and
</blockquote>
</blockquote>

        vii.     such other miscellaneous notices as the Debtors or Court may deem necessary or appropriate for an orderly administration of the Chapter 11 Cases.

    (k)     assisting with solicitation of votes and tabulation of ballots in connection with a plan of reorganization; andproviding such other claims processing, noticing, balloting and administrative services as may be requested from time to time by the Debtors.

40.     In addition to the foregoing, KCC will assist with, among other things: (a) maintaining and updating the master mailing lists of creditors; (b) to the extent necessary, gathering data in conjunction with the preparation of the Debtors' schedules of assets and liabilities and statements of financial affairs; (c) tracking and administration of claims; and (d) performing other administrative tasks pertaining to the administration of the Chapter 11 Cases, as may be requested by the Debtors or the Clerk's Office. KCC will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk of the Court and the Judicial Conference of the United States and as may be entered by the Court's order.

41.     The fees to be charged by KCC in connection with these Chapter 11 Cases are set forth in the Services Agreement. The Debtors propose that the cost of KCC's services be paid from the Debtors' estates. The Debtors respectfully submit that KCC's rates for its services in connection with the notice, claims processing and solicitation services are competitive and comparable to the rates charged by their competitors for similar services.

42.     As an administrative agent and adjunct to the Court, the Debtors do not believe that KCC is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code or whose compensation is subject to approval of the Court under sections 330 and 331 of the Bankruptcy Code. Furthermore, the Debtors respectfully submit that the fees and expenses incurred by KCC are administrative in nature and, therefore, should not be subject to the standard fee application procedures for professionals. Specifically, the Debtors request

authorization to compensate KCC in accordance with the terms and conditions set forth in the Services Agreement, upon KCC's submission to the Debtors of monthly invoices summarizing in reasonable detail the services rendered and expenses incurred in connection with services provided by KCC to the Debtors or the Clerk's Office. Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the Debtors request that the fees and expenses of KCC under the Services Agreement be allowed as administrative expenses of the Debtors' estates.

43. Notwithstanding the foregoing, the Debtors have nonetheless requested that KCC conduct a conflicts check to determine whether it meets the "disinterestedness" standard of section 327(a) of the Bankruptcy Code. The results of this conflicts check are set forth in the Le Affidavit attached to the KCC Application as Exhibit B.

44. In reliance on the Le Affidavit, the Debtors believe that KCC does not hold or represent an interest materially adverse to the Debtors' estates. Further, in reliance on the Le Affidavit, the Debtors also believe that KCC is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code because its members and employees:

 (a) are not creditors, equity security holders or insiders of the Debtors;

 (b) are not and were not, within two years before the date of filing of the Debtors' chapter 11 petitions, directors, officers or employees of the Debtors; and

 (c) do not have interests materially adverse to the interest of the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors, or for any other reason.

45. As part of its retention, KCC agrees, among other things, that:

 (a) KCC will not consider itself employed by the United States government and will not seek any compensation from the United States government in its capacity as the Notice and Claims Agent in these Chapter 11 Cases;

(b)        by accepting employment in these Chapter 11 Cases, KCC waives any rights to receive compensation from the United States government;

(c)        in its capacity as the Notice and Claims Agent in these Chapter 11 Cases, KCC will not be an agent of the United States government and will not act on behalf of the United States government; and

(d)        KCC will not employ employees of the Debtors in connection with its work as the Notice and Claims Agent in these Chapter 11 Cases.

46.      For all of the foregoing reasons, the Debtors believe that the retention of KCC as the Notice and Claims agent in these Chapter 11 Cases is in the best interests of the Debtors, their estates and creditors.

## III.   OPERATIONAL MOTIONS

**A.   Debtors' Emergency Motion for Interim and Final Orders (a) Authorizing the Debtors to Use Cash Collateral of Existing Secured Lenders and Granting Adequate Protection for Use and (b) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing  (the "<u>Cash Collateral Motion</u>")**

47.      By the Cash Collateral Motion, the Debtors are seeking the entry of an interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>Cash Collateral Orders</u>"), (a) authorizing the Debtors to use the cash collateral of existing secured lenders and granting adequate protection to existing secured lenders for such use and (b) prescribing the form and manner of notice and setting the time for the final hearing on the Motion (the "<u>Final Hearing</u>").

48.      Debtor BPC is party to a Credit Agreement dated as of January 16, 2008 (the "<u>Prepetition Credit Agreement</u>") with Credit Suisse, Cayman Islands Branch, as administrative agent (the "<u>Prepetition Agent</u>"), and certain lender parties (collectively, the "<u>Prepetition Senior Lenders</u>"), pursuant to which the Prepetition Senior Lenders extended to the Debtors:  (a) a senior secured term loan in the original principal amount of $387,500,000 (the "<u>Prepetition Term</u>

Loan"), of which up to $203,000,000 was to be available for construction-related expenses (the "Prepetition Construction Sub-Amount") and up to $65,000,000 was to be available to cash collateralize letters of credit through related letter of credit facilities (the "Prepetition Deposit L/C Sub-Amount"); and (b) a senior secured revolving credit facility (the "Prepetition Revolver") in the original committed amount of $25,000,000 (where applicable, the Prepetition Term Loan and Prepetition Revolver are hereinafter collectively referred to as the "Prepetition Credit Facility").

49. The Prepetition Agent and Prepetition Senior Lenders assert that the Prepetition Credit Facility is secured by first-priority liens on and security interests in substantially all of BPC's real and personal property (collectively, the "Prepetition Collateral").

50. As of the Petition Date, BPC was obligated under the Prepetition Credit Facility in the approximate aggregate principal amount of $408,302,500, of which approximately $383,302,500 is outstanding principal on account of the Prepetition Term Loan and approximately $25,000,000 is outstanding principal on account of the Prepetition Revolver.

51. Pursuant to the terms of the Prepetition Credit Agreement, the Debtors were authorized to enter into a letter of credit facility, secured by cash collateral in an amount up to the Prepetition Deposit L/C Sub-Amount, and one or more interest rate and power hedge agreements, secured by first-priority liens on the Prepetition Collateral (liens *pari passu* with those granted by the Debtors to the Prepetition Agent for the benefit of itself and the Prepetition Senior Lenders), subject to the terms and conditions of the Prepetition Intercreditor Agreement (defined below).

52. Debtor BPC is party to certain letter of credit applications and agreements (collectively, the "Prepetition Letter of Credit Facility") with JPMorgan Chase Bank, N.A.

("JPM" and, collectively, with the Prepetition Agent, the Prepetition Senior Lenders, the lender parties to the Prepetition Intercreditor Agreement (as defined below), the secured parties under the Commodity Hedge Agreements (as defined below) and the secured parties under the Interest Rate Hedge Agreements (as defined below), the "Prepetition Secured Lenders"), pursuant to which JPM agreed to issue for the account of Debtor BPC one or more standby or commercial letters of credit (the "JPM Letters of Credit"). As of the Petition Date, four JPM Letters of Credit in the aggregate amount of $48,500,000 remain outstanding, which JPM Letters of Credit are fully secured by cash collateral (invested in certificates of deposit) at JPM (and with respect to which Debtor BPC executed various Assignments of Deposit Account).

53.     Debtors BPC and Partners are grantors under a Collateral Agency and Intercreditor Agreement dated as of January 16, 2008 (the "Prepetition Intercreditor Agreement") with the Prepetition Agent, as collateral agent (the "Prepetition Collateral Agent") for the Secured Parties (as defined in the Prepetition Intercreditor Agreement) and as Prepetition Agent under the Prepetition Credit Agreement, and the debt representatives from time to time party to the Prepetition Intercreditor Agreement, pursuant to which (given that the Prepetition Collateral secures the Debtors' obligations under both the Prepetition Credit Agreement (described above) and the hedge agreements (described below)) the Prepetition Collateral Agent agreed to act on behalf of all secured parties with respect to the Prepetition Collateral and entered into the Prepetition Intercreditor Agreement to, among other things, define the rights, duties, authority and responsibilities of the Prepetition Collateral Agent and the relationships among the Secured Parties (as defined in the Prepetition Intercreditor Agreement) regarding their respective interests in the Prepetition Collateral.

54.     Debtors BPC and FMT are parties to an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement dated as of October 23, 2008 (including each confirmation entered into pursuant to such ISDA Master Agreement, the "Commodity Hedge Agreements"), pursuant to which BPC and FMT entered into one or more hedging transactions. Under the Commodity Hedge Agreements, FMT is required to maintain letter of credit support for its payment obligations to BPC. On June 1, 2009, pursuant to separate letter of credit reimbursement agreements, Credit Suisse, Cayman Islands Branch, as issuing bank, issued two letters of credit for the account of FMT: (a) a letter of credit in the amount of $10,000,000 (as amended, the "Cash Collateralized LC"), which was fully drawn prior to the Petition Date; and (ii) a letter of credit in the amount of $12,150,000 (as amended, the "Securities Collateralized LC"), which is secured by a pledge of the equity interests by Debtors BPD, BDBI and BDBII in Partners and supported by the Commitment Letter dated June 1, 2009, between Arcapita Bank B.S.C.(c) ("Arcapita") and FMT. The amount available for drawing under the Securities Collateralized LC automatically decreases each month in accordance with a schedule. As of the Petition Date, Debtor FMT is current on its reimbursement obligations owing to Debtor BPC.

55.     Debtors BPC and FMT are parties to an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement dated as of October 23, 2008 (including each confirmation entered into pursuant to such ISDA Master Agreement, the "Commodity Hedge Agreements"), pursuant to which BPC and FMT entered into one or more hedging transactions. Under the Commodity Hedge Agreements, FMT is required to maintain letter of credit support for its payment obligations to BPC. On June 1, 2009, pursuant to separate letter of credit reimbursement agreements, Credit Suisse, Cayman Islands Branch, as issuing bank, issued two letters of credit for the account of FMT: (a) a letter of credit in the amount of $10,000,000 (as

amended, the "Cash Collateralized LC"), which was fully drawn prior to the Petition Date; and (ii) a letter of credit in the amount of $12,150,000 (as amended, the "Securities Collateralized LC"), which is secured by a pledge of the equity interests by Debtors BPD, BDBI and BDBII in Partners and supported by the Commitment Letter dated June 1, 2009, between Arcapita Bank B.S.C.(c) ("Arcapita") and FMT. The amount available for drawing under the Securities Collateralized LC automatically decreases each month in accordance with a schedule. As of the Petition Date, Debtor FMT is current on its reimbursement obligations owing to Debtor BPC.

56.     Debtor BPC and Credit Suisse, Cayman Islands Branch, as swap provider (the "Prepetition Swap Provider"), are parties to an ISDA Master Agreement dated as of January 16, 2008 (including each confirmation entered into pursuant to such ISDA Master Agreement, the "Interest Rate Hedge Agreements"), pursuant to which BPC and the Prepetition Swap Provider entered into one or more interest rate hedging transactions to protect Debtor BPC from fluctuations in interest rates. Debtor BPC's obligations to the Prepetition Swap Provider under the Interest Rate Hedge Agreements are secured by first-priority liens on the Prepetition Collateral (liens *pari passu* with those granted by the Debtors to the Prepetition Agent for the benefit of itself and the Prepetition Senior Lenders), subject to the terms and conditions of the Prepetition Intercreditor Agreement. Assuming that the swaps are terminated as of December 31, 2009, the termination value owed by Debtor BPC to the Prepetition Swap Provider under the Interest Rate Hedge Agreements is approximately $5,296,081.

57.     As of the Petition Date, certain parties may hold mechanics and materialmen's liens (the "M&M Liens") on certain of the Debtors' assets. To the extent that such M&M Liens are valid, enforceable, non-avoidable, perfected and attached to property of the Debtors, such M&M Liens shall remain unaffected by this Motion.

21

58.     Not unlike nearly every other asset and business in the United States, the Debtors'

assets and going concern value are worth less today than they were in early 2008, when the

Debtors entered into the Prepetition Credit Agreement.  These Chapter 11 Cases principally are

balance sheet, and not operational, restructuring cases.  The Debtors operate at a profit.  In 2009,

the Debtors generated approximately $6 million in earnings before interest, taxes, depreciation

and amortization ("EBITDA").  The Debtors project positive EBITDA for 2010 in excess of $9

million.  The Debtors intend to use Cash Collateral to operate their business while they explore

various restructuring alternatives.

59.     By the Cash Collateral Motion, pursuant to sections 105, 361 and 363 of the

Bankruptcy Code and Bankruptcy Rules 4001 and 9014, the Debtors request that the Court grant

the following relief as provided for in the Interim Order and the Final Order:

> a.      authorize the Debtors on an interim basis, pursuant to section 363(c) of the
> Bankruptcy Code, to use proceeds of assets on which the Prepetition Secured
> Lenders assert first-priority liens and security interests (the "Cash Collateral")[1] in
> accordance with the budget (as amended from time to time, the "Budget")
> attached to the Interim Order as Exhibit 1;

---

[1] The Debtors do not hereby make any admission with respect to the validity, priority, extent or enforceability of the liens asserted by the Prepetition Secured Lenders and hereby reserve all rights with respect thereto.  In fact, the Debtors note that, under the terms of the Depositary Agreement dated as of January 16, 2008 (the "Depositary Agreement"), among Debtor BPC, as borrower, the Prepetition Collateral Agent, as collateral agent, and JPM, as depositary bank, certain cash being held on the Petition Date by JPM in certificates of deposit in amounts in excess of those necessary to fully cash collateralize the JPM Letters of Credit, are not "Accounts" in which the Prepetition Collateral Agent was granted a security interest (i.e., "any cash collateral account established in connection with any Related LC Facility" was expressly carved out from the definition of "Accounts" and not pledged to the Prepetition Collateral Agent under the Depositary Agreement).  Therefore, given that the Prepetition Collateral Agent does not have a security interest in the cash being held in the Debtors' certificates of deposit at JPM and such cash, as JPM Letters of Credit expire on a rolling basis, is in excess of that properly held by JPM to secure Debtor BPC's obligations under the JPM Letters of Credit (the "Excess Cash"), these amounts may not constitute the Prepetition Secured Lenders' "Cash Collateral."  That notwithstanding, out of an abundance of caution, the Debtors are seeking the authority requested herein.  The amount of such "Excess Cash" being held by JPM as of the Petition Date is approximately $11,183,000.  The Debtors intend to open at JPM a new debtor-in-possession account into which the Debtors will deposit Excess Cash.  The Debtors intend to fund negative cash flow, in amounts set forth in any approved Budget, with such Excess Cash.  The Debtors and the Prepetition Secured Lenders reserve all of their respective rights with regard to an ultimate determination by this Court, should such a determination become necessary, of (a) whether the Excess Cash is subject to a valid, perfected, enforceable prepetition lien in favor of the Prepetition Collateral Agent and, as such, constitutes cash collateral; and (b) whether proceeds of the Excess Cash are proceeds of non-cash collateral (and therefore, unencumbered) or proceeds of the cash collateral (and therefore, encumbered).

1130/15973-001 Current/18289620v1

b. authorize the Debtors on an interim basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Lenders with respect to any diminution in value of the Prepetition Secured Lenders' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral;

c. schedule the Final Hearing, pursuant to Bankruptcy Rule 4001 to consider entry of a Final Order authorizing the use of Cash Collateral and approving the notice procedures in respect of the Final Hearing;

d. authorize the Debtors on a final basis, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral in accordance with the Budget and any supplemental Budgets as approved by the Court after further notice and hearing;

e. authorize the Debtors on a final basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Lenders with respect to any diminution in value of the Prepetition Secured Lenders' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral.

60. The Debtors have an urgent need for the immediate use of the Cash Collateral pending the final hearing on this Motion. Accordingly, the Debtors seek to use Cash Collateral existing on or after the Petition Date that may be subject to the Prepetition Secured Lenders' liens. As of the Petition Date, the Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.

61. Absent the ability to use Cash Collateral, the Debtors will not be able to pay insurance, contractual obligations, utility charges and other critical operating expenses. Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and continue their restructuring efforts and would likely be forced to cease operations and liquidate. Accordingly, the Debtors' estates would be immediately and irreparably harmed.

62. If the Debtors are unable to obtain sufficient operating liquidity to meet their postpetition obligations on a timely basis, a permanent and irreplaceable loss of business will occur, causing a loss of value to the detriment of the Debtors and their creditors. This potential

loss of revenue and going concern value would be extremely harmful to the Debtors, their estates and their creditors at this critical juncture.

63.     Any lapse in operation, no matter how transitory, could have a devastating economic impact on the going concern value of the Debtors' business.  Such a lapse could lead to, among other negative consequences:  (a) an inability of the Debtors to continue making improvements to the facility, which improvements will permit the Debtors to increase power output capacity during the lucrative summer months quickly approaching; (b) a payment default under the Debtors' Operation and Management Agreement (the "O&M Agreement") with Wood Group Power Operations (West) Inc. ("Wood Group"), which would permit Wood Group to terminate the O&M Agreement, thus terminating the Wood Group employees who operate the Debtors' facility (who, in turn, may find employment at other facilities in the area searching for experienced operators); (c) a need to find, hire and train persons to operate and maintain the Debtors' facility; (d) a payment default under the Energy Management Agreement (the "EMA") with EDF Trading North America, LLC ("EDF"), which would permit EDF to terminate the EMA, and, if the Debtors' operations were to restart, EDF or another energy manager would likely require enhanced credit support from the Debtors to cover the risk of non-payment of lost variable profit from lost gross margin from the Debtors; (e) a payment default under the Long Term Service Agreements (the "LTSAs") with General Electric International, Inc. ("GE"), which would permit GE to terminate the LTSAs (therefore, assuming that the LTSAs are better priced than current market conditions, GE's termination thereof would cause the Debtors to incur potentially substantial additional costs in entering into, or enticing GE to enter into amended, LTSAs); and (f) the Debtors' inability to procure consumables, spare and replacement parts and services without prepaying.  The Debtors estimate that, in the event that even some of these

24

contingencies were to materialize, restarting the Debtors' power operations following a lapse could cost tens of millions of dollars.

64.    The Debtors cannot obtain funds sufficient to administer their estates and operate their business other than by obtaining the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Accordingly, the Debtors' management has formulated the Budget for the use of Cash Collateral from the Petition Date through three (3) weeks hereafter.  The Debtors believe that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of their business and their restructuring efforts for the period set forth in the Budget.  The Debtors also believe that the use of Cash Collateral in accordance with the Budget will provide the Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

65.    The Debtors' propose that their right to use Cash Collateral under the Interim Order shall commence on the date of the entry of the Interim Order and expire on the earlier of (a) the entry of a subsequent interim order or (b) the entry of the Final Order.

66.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may only use "cash collateral" with the consent of the secured party with an interest therein or court approval.  The Debtors assert that the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are adequately protected by the granting of replacement liens (only to the extent that their prepetition security interests are valid, perfected and enforceable), the continued operation of the Debtors' power plant, the completion of ongoing maintenance at the plant and the completion of the conversion of two simple-cycle

1130/15973-001 Current/18289620v1

combustion turbines to combined-cycle configuration with a capacity of over 800 megawatts (the "Conversion").

67.     As adequate protection for any diminution in value of the Prepetition Secured Lenders' interests or the interests of the holders of valid, enforceable, non-avoidable, perfected M&M Liens, the Debtors request that the Court grant the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens security interests ("Replacement Liens"), equivalent to liens granted under section 364(c)(2) and (3) of the Bankruptcy Code, as applicable, in and upon the Debtors' real and personal property and the Cash Collateral, whether such property was acquired before or after the Petition Date (collectively, the "Collateral"), to the extent:  (a) that the Prepetition Secured Lenders' prepetition security interests in the Prepetition Collateral are valid, perfected and enforceable; and (b) of the amount of any diminution in value of the Prepetition Secured Lenders' Prepetition Collateral.  If granted, the Replacement Liens will adequately protect the Prepetition Secured Lenders' interests and the interests of and the holders of valid, enforceable, non-avoidable, perfected M&M Liens from any potential depreciation and deterioration.  The Replacement Liens shall be of the same validity and priority as the liens of the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens on the Prepetition Collateral.

68.     In addition to the proposed Replacement Liens, the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are also adequately protected as a result of the continuation of the Debtors' business operations.  Without the use of the Cash Collateral, the Debtors would forego business opportunities (including preparing the facility to be fully operational for the lucrative summer months) and their operations would be

1130/15973-001 Current/18289620v1

irreparably harmed, with a consequential decrease in the value of the Debtors' business and the value of the Collateral. Indeed, absent use of the Cash Collateral, the Debtors will be unable to pay their ordinary business expenses, including, among others, the wages of the Wood Group's employees who operate the Debtors' facility, ongoing maintenance and completion of the Conversion. In that event, all operations may cease – the Wood Group's employees will be terminated, the Debtors' facility will close and all assets on which the Prepetition Secured Lenders assert a lien will sit idle, without any kind of protective services. Those pledged assets (including accounts receivable, machinery and equipment and real property) will be worth less if the facility closes than they are worth now and will be worth when the maintenance and Conversion are completed. Given that the Debtors have generated positive EBITDA in the past and project positive EBITDA for the future, use of Cash Collateral to operate the business and maintain going concern value provides adequate protection to the Prepetition Secured Lenders. As current going concern value exceeds liquidation value, and the expected value upon completion of maintenance and the Conversion will exceed current value by more than the amount of Cash Collateral sought to be used, adequate protection is being provided. The Prepetition Secured Lenders are receiving Replacement Liens in that cash to adequately protect them against the Debtors' use of approximately $1,178,000 for the next three weeks. As reflected in the Budget, the Prepetition Secured Lenders' cash position will improve over the course of that period by approximately $139,000 (*i.e.*, beginning cash collateral as of March 24, 2010 is approximately $1.1 million and the Debtors project that ending cash collateral as of April 9, 2010 will be $1.24 million).

69. The continuation of the Debtors' operations likely presents the best opportunity for the Prepetition Secured Lenders to receive the greatest recovery on account of their claims.

1130/15973-001 Current/18289620v1

Accordingly, the Debtors submit that use of the Cash Collateral will allow the Debtors to continue their operations and thereby protect the Prepetition Secured Lenders' interests.

70.     In summary, the Debtors submit that the Prepetition Secured Lenders and the holders of valid, enforceable, non-avoidable, perfected M&M Liens are adequately protected by the proposed Replacement Liens in the Collateral and by maintaining the business of the Debtors as a going concern, completing current maintenance on the facility, completing the Conversion, and thereby (a) having a fully-operational power plant by the start of the key summer season, and (b) otherwise preventing diminution in the overall value of the Prepetition Collateral.

71.     The Debtors respectfully request that the Court conduct an expedited preliminary hearing on this Motion and authorize the Debtors (from and after the entry of the Interim Order and pending the Final Hearing) to use the Cash Collateral in accordance with the Budget for, among other things, working capital purposes and the payment of certain obligations in accordance with the relief authorized by the Court.  Interim access to the Cash Collateral will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

72.     The Debtors submit that, for the reasons set forth herein, immediate access to the use of Cash Collateral (first, on an interim basis as requested in this Motion), on the terms set forth in the Budget, is necessary to preserve the value of the Debtors' estates for the benefit of all parties in interest.

**B.      Debtors' Emergency Motion for Order Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System and Granting Other Relief (the "Cash Management Motion")**

73.     Pursuant to the Cash Management Motion, the Debtors are seeking entry of an order authorizing the Debtors to maintain existing bank accounts, to continue to use existing

business forms, to continue to use certain existing cash management systems and for related relief.

74.     The United States Trustee has established Operating Guidelines for Chapter 11 Cases (the "Operating Guidelines") applicable to debtors in possession that continue to operate their businesses after the commencement of their chapter 11 cases. One provision of the Operating Guidelines requires a chapter 11 debtor in possession to open new bank accounts and to close all existing accounts. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the bankruptcy filing.

75.     Prior to the Petition Date, the Debtors, in the ordinary course of their business, maintained several bank accounts. The Debtors' existing bank accounts are listed and described on Exhibit A to the Cash Management Motion (collectively, the "Bank Accounts"). The Debtors request authority to maintain existing Bank Accounts and to open at JPM one new debtor-in-possession account (the "DIP Account"), not subject to the terms and conditions of the Depositary Agreement (as defined below), into which the Debtors will deposit "Excess Cash" (as defined below) and use in accordance with budgets approved by the Court.[1]

76.     The Debtors seek a waiver of the Operating Guideline's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened. If enforced in these Chapter 11 Cases, this requirement would cause undue disruption to the Debtors' continued

---

[1]  The Debtors intend to fund negative cash flow, in amounts set forth in any approved Budget, with such Excess Cash. The Debtors and the Prepetition Secured Lenders reserve all of their respective rights with regard to an ultimate determination by this Court, should such a determination become necessary, of (a) whether the Excess Cash is subject to a valid, perfected, enforceable prepetition lien in favor of the Prepetition Collateral Agent; and (b) whether proceeds of the Excess Cash are proceeds of non-cash collateral (and therefore, unencumbered) or proceeds of the cash collateral (and therefore, encumbered).

operations and would impair their efforts to maximize value through this chapter 11 process. Dismantling the Debtors' cash management system would likely disrupt the Debtors' relationships with their key stakeholders and may hinder their abilities to maintain operations pending their reorganization.

77.     Maintenance of the Bank Accounts would greatly facilitate the Debtors' transition to postpetition operations and preserve the value of the Debtors.  To avoid delays in payment of debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the Bank Accounts and to open the DIP Account.  Closing the Bank Accounts and transferring the funds in those accounts to newly created postpetition accounts would be disruptive and time consuming.  Moreover, requiring the Debtors to close or alter the Bank Accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtors' estates and creditors.   Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtors request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue the use of these Bank Accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.  If the relief requested herein is granted, the Debtors will not pay, and the bank where the Bank Accounts are maintained will be directed not to pay, any debts incurred before the Petition Date, other than as specifically authorized by this Court.

78.     To minimize expense to their estates, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead,

purchase orders, invoices, etc.) and checks existing as of the Petition Date, without reference to their status as debtors in possession.

79.     Because of the nature of the Debtors' business and the notice of consummation of cases that will be sent to all of the Debtors' stakeholders and creditors, parties doing business with the Debtors likely will be made aware of the Debtors' status as chapter 11 debtors in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. For these reasons, the Debtors request authority to use their existing checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

80.     The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this cash management system will prevent undue disruption to their businesses and operations, while protecting their cash for the benefit of their estates.

81.     The principal components of the Debtors' cash management system and the flow of funds among the various Bank Accounts are as follows:

- *Revenue Account (JPM acct. no. ending 0825)*. The Debtors deposit into the Revenue Account all revenue, proceeds of their revolving loans and payments to the Debtors under interest rate hedge agreements and commodity hedge agreements. Amounts in the Revenue Account are distributed by JPMorgan Chase Bank, N.A. ("JPM"), the Debtors' primary bank, on specified dates and in accordance with the following waterfall (subject to availability): (a) first, to the O&M Account, the sum of all actual and projected operation and maintenance expenses; (b) second, to pay the fees and expenses of JPM and Credit Suisse, Cayman Islands Branch, as administrative agent (the "Prepetition Agent") under the Credit Agreement dated as of January 16, 2008 among Debtor BPC, the Prepetition Agent and other lenders (the "Prepetition Credit Agreement"), and as collateral agent (the "Prepetition Collateral Agent") under the Collateral Agency and Intercreditor Agreement dated as of January 16, 2008 (the "Prepetition Intercreditor Agreement") among Debtors BPC and Partners, the Prepetition Collateral Agent and other secured parties; (c) third, to the Interest Payment Account, fees and interest payable under the Prepetition Credit Agreement,

payments due to counterparties under the Debtors' secured interest rate hedge agreements and payments due to counterparties under the Debtors' other eligible hedge agreements; (d) fourth, to the Tax Distribution Account, tax distributions; (e) fifth, to Prepetition Agent, the voluntary prepayments of all or any portion of the outstanding principal of the revolving loans; (f) sixth, to the Principal Payment Account, the principal amount of outstanding credit extensions and payments in respect of termination, liquidation or unwind payments under any secured hedge agreement; (g) seventh, to the DSR Account, debt service reserve payments; (h) eighth, to the Major Maintenance Account, major maintenance account funds; (i) ninth, to the Prepetition Agent, voluntary prepayments of obligations under the Prepetition Credit Agreement; (j) tenth, to the Tax Distribution Account, additional tax distributions; (k) eleventh, to Prepetition Agent, prepayments of all or any portion of the outstanding principal of the term loans; and (l) twelfth, to Debtor BosPower.

- *O&M Account (JPM acct. no. ending 0826); Local Accounts (Bosque Power Company LLC – JPM acct. no. ending 4928; Bosque Power Co. LLC – JPM acct. no. ending 4936; BosPower Partners LLC – JPM acct. no. ending 5235; and Fulcrum Marketing & Trade LLC – JPM acct. no. ending 5294).* The Debtors use the O&M and Local Accounts from which to pay operation and maintenance expenses.

- *DSR Account (JPM acct. no. ending 0827).* In the event that the balance of the Revenue Account is insufficient for the Debtors to make payments of: (a) fees and expenses of JPM, the Prepetition Agent and the Collateral Agent; (b) fees and interest payable under the Prepetition Credit Agreement, payments due to counterparties under the Debtors' secured interest rate hedge agreements and payments due to counterparties under the Debtors' other eligible hedge agreements; and/or (c) the principal amount of outstanding credit extensions, payments in respect of termination, liquidation or unwind payments under any secured hedge agreement, the Debtors may use the DSR Account (to the extent such funds are available therein) to make such payments.

- *Construction Account (JPM acct. no. ending 0828).* The Construction Account was funded by proceeds of the term loans made to the Debtors to pay construction costs relating to the Debtors' development, finance, construction and completion of the Debtors' conversion of two single-cycle power generating facilities, together with certain shared ancillary facilities, into a 2 x 1 combined-cycle generating facility.

- *Loss Proceeds Account (JPM acct. no. ending 0829).* The Debtors deposit loss proceeds (*i.e.*, cash proceeds received by the Debtors as a result of the occurrence of an event of loss, net of collection expenses) and condemnation proceeds (*i.e.*, cash proceeds received by the Debtors as a result of the occurrence of any action or series of actions to condemn, seize, appropriate or otherwise take any portion of the Debtors' assets) into the Loss Proceeds Account. Such amounts may be used by the Debtors to perform restoration work.

- *Major Maintenance Account (JPM acct. no. ending 0830).* Amounts in the Major Maintenance Account (funded to a target amount in accordance with the waterfall set forth in the above-described "Revenue Account") are transferred to the O&M Account and the Local Accounts to pay for major maintenance expenses (*i.e.*, required by law, necessary to protect human health, safety or the environment or otherwise necessary in order to maintain and operate the Debtors' facility in accordance with prudent industry practices).

- *Interest Payment Account (JPM acct. no. ending 0831).* Amounts in the Interest Payment Account (funded to in accordance with the waterfall set forth in the above-described "Revenue Account") are transferred to: (a) the Prepetition Agent, on account of fees and interest payable under the Prepetition Credit Agreement; (b) counterparties under the Debtors' secured interest rate hedge agreements, on account of payments due and payable (other than termination, liquidation and unwind payments) under such agreements; and (c) counterparties under the Debtors' other eligible hedge agreements, on account of payments due and payable (other than termination, liquidation and unwind payments) under such agreements.

- *Principal Payment Account (JPM acct. no. ending 0832).* Amounts in the Principal Payment Account (funded in accordance with the waterfall set forth in the above-described "Revenue Account" and by fifty percent (50%) of any net cash proceeds of any sale or issuance by the Debtors of any capital securities thereof or warrants or options with respect thereto, which are to be deposited into the Principal Payment Account and not the Revenue Account) are transferred to: (a) the Prepetition Agent, on account of principal and, if applicable, premium payable under the Prepetition Credit Agreement; and (b) counterparties under the Debtors' secured hedge agreements, on account of termination, liquidation and unwind payments due and payable under such agreements.

- *Tax Distribution Account (JPM acct. no. ending 0836).* At the direction of the Debtors, amounts in the Tax Distribution Account (funded in accordance with the waterfall set forth in the above-described "Revenue Account") are transferred to pay to any holder of the equity interests of Debtor BPC in order to allow such holder (or, if such holder is a pass-through entity for tax purposes, such holder's direct or indirect equity owners) to pay U.S. federal and, if any, applicable local and state, income, franchise or doing business taxes attributable to the income, receipts or capital of Debtor BPC or its subsidiaries, but not payable directly by Debtor BPC and its subsidiaries.

- *Deposit L/C Account (JPM acct. no. ending 0833).* The Deposit L/C Account was funded by proceeds of the term loans made to the Debtors to cash collateralize letters of credit to be issued pursuant to a letter of credit facility supported solely by the pledge of deposit accounts, securities accounts or cash collateral (a "<u>Related LC Facility</u>"). At the direction of the Debtors, JPM transfers funds from the Deposit L/C Account in the amount of the required cash collateralization

pursuant to such Related LC Facility to the L/C Cash Collateral Accounts and the Bosque Power Co. LLC Account.

- *L/C Cash Collateral Certificate of Deposit Accounts (Bosque Power – JPM acct. nos. ending 5760, 9880, 9900, 0321, 1656 and 3108) and Bosque Power Co. LLC – JPM acct. no. ending 7076).* The certificate of deposit accounts are cash collateral accounts established in connection with the letter of credit applications and agreements (collectively, the "Prepetition Letter of Credit Facility") between Debtor BPC and JPM. Under the terms of the Depositary Agreement dated as of January 16, 2008 (the "Depositary Agreement"), among Debtor BPC, as borrower, the Prepetition Collateral Agent, as collateral agent, and JPM, as depositary bank, the cash being held on the Petition Date by JPM in the certificates of deposit in amounts in excess of those necessary to fully cash collateralize letters, are not "Accounts" in which the Prepetition Collateral Agent was granted a security interest (*i.e.*, "any cash collateral account established in connection with any Related LC Facility" was expressly carved out from the definition of "Accounts" and not pledged to the Prepetition Collateral Agent under the Depositary Agreement). Therefore, given that the Prepetition Collateral Agent does not have a security interest in the cash being held in the Debtors' certificates of deposit at JPM and such cash, as letters of credit issued by JPM for the account of Debtor BPC expire on a rolling basis, is in excess of that properly held by JPM to secure Debtor BPC's obligations under the JPM Letters of Credit (the "Excess Cash"), these amounts may not constitute the Prepetition Secured Lenders' "Cash Collateral." The amount of such "Excess Cash" being held by JPM as of the Petition Date is approximately $26,500,000.[1]

- *Debt Proceeds Account (JPM acct. no. ending 0834).* Gross cash proceeds received by the Debtors from the incurrence, sale or issuance of indebtedness are deposited into the Debt Proceeds Account for: (a) payment of expenses incurred in connection with such incurrence, sale or issuance of indebtedness; (b) to the extent required by the Prepetition Credit Agreement, transfer to the Principal Payment Account; and (c) transfer to one of the Accounts as described herein as directed by the Debtors.

- *Disposition Proceeds Account (JPM acct. no. ending 0835).* Cash proceeds received by the Debtors from any disposition of assets (in excess of $1,500,000) are deposited into the Disposition Proceeds Account for: (a) payment of expenses incurred in connection with such disposition; (b) to the extent required by the Prepetition Credit Agreement, transfer to the Principal Payment Account; and (c) the acquisition of assets or properties permitted to be purchased under the Prepetition Credit Agreement. Amounts remaining in the Disposition Proceeds

---

[1] The Debtors and the Prepetition Secured Lenders reserve all of their respective rights with regard to an ultimate determination by this Court, should such a determination become necessary, of (a) whether the Excess Cash is subject to a valid, perfected, enforceable prepetition lien in favor of the Prepetition Collateral Agent and, as such, constitutes cash collateral; and (b) whether proceeds of the Excess Cash are proceeds of non-cash collateral (and therefore, unencumbered) or proceeds of the cash collateral (and therefore, encumbered).

Account for a period of twenty-one (21) months from deposit, JPM transfers such amounts to the Principal Payment Account.

82.     The Debtors hereby seek authority to continue utilizing their current cash management system, to open the DIP Account, to deposit the "Excess Cash" therein and to use such DIP Account in accordance with any Budget approved by this Court. The Debtors' continued operation and the preservation and enhancement of their going concern value will be inhibited if there is substantial disruption in the Debtors' cash management system. It is essential, therefore, that the Debtors be permitted to continue to consolidate the management of their cash as needed and in the amounts necessary to continue the operation of their businesses.

83.     The basic structure of the Debtors' cash management system constitutes the Debtors' ordinary, usual and essential business practice. The cash management system is similar to those commonly employed by enterprises comparable in size and complexity to the Debtors. The widespread use of such systems is attributable to the numerous benefits they provide, including the ability: (a) to tightly control corporate funds; (b) to ensure cash availability; and (c) to reduce administrative expenses by facilitating the movement and concentration of funds and the development of timely and accurate account balance and presentment information.

84.     If the Debtors are not permitted to continue to use their cash management system as described herein, their operations likely will not only be impaired, but critical funds may not be collected on account of accounts receivable and valuable resources will be expended unnecessarily in implementing a new cash management system. Accordingly, the Court should authorize the Debtors' continued use of the existing cash management system.

85.     It is critical to the continued operation of the Debtors' businesses and to the preservation of the value of those businesses that the Debtors continue to utilize their existing cash management system without disruption.

1130/15973-001 Current/18289620v1

86. Section 345(a) of the Bankruptcy Code authorizes debtors in possession to deposit or invest an estate's money (including cash) so as to yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment. While section 345(b) of the Bankruptcy Code requires that, generally, with respect to investments other than those "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States" the estate must require a bond in favor of the United States secured by the undertaking of a court-approved corporate surety, the Court is allowed to dispense with this limitation "for cause."

87. The request that the Court waive the requirements of section 345(b) of the Bankruptcy Code on an interim basis and permit them to maintain deposits in their accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval, on a final basis, to deviate from such requirements.

**C. Debtors' Emergency Motion Pursuant to Section 366 of the Bankruptcy Code for Entry of Interim and Final Orders: (a) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (b) Determining that Utility Companies are Adequately Assured of Future Payment; (c) Authorizing the Debtors to Establish the Utility Deposit Account and Pay the Adequate Assurance Deposit; (d) Establishing Procedures to Object to the Motion; and (e) Granting Certain Related Relief (the "<u>Utilities Motion</u>")**

88. The Debtors currently use electric, natural gas, heat, water, sewer, telecommunications and other similar services provided by the Utility Companies identified on <u>Exhibit A</u> to the Utilities Motion (the "<u>Utility List</u>").[1] The Debtors' Utility Companies provide

---

[1] The Debtors have made an extensive good faith effort to identify all of the Utility Companies that provide service to the Debtors and include them on the Utility List. To the extent such information is readily ascertainable, the Utility List identifies the following information for each Utility Company: (a) the name and address of the Utility Company; (b) the account number or numbers under which the Utility Company provides services to the Debtors; and (c) the Adequate Assurance Deposit (as defined below) proposed by the Debtors for such Utility Company. The inclusion of any entity on, or any omission of any entity from, the Utility List is not an admission by the Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve their rights with respect thereto. In addition, the Debtors request that the Utilities Motion apply to all of the

traditional utility services related to the day-to-day operation of the Debtors' various facilities and offices. The Debtors estimate that their aggregate average monthly obligations to the Utility Companies on account of services rendered total approximately $75,000. The Debtors believe that they are generally current on all prepetition obligations due the Utility Companies, other than (a) the accrued, but unbilled or (b) the billed, but not yet due, prepetition obligations for utility services.

89.     Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful restructuring. The Debtors could not maintain their facilities in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors.

90.     The Debtors intend to timely pay their postpetition obligations to the Utility Companies. The Debtors will make these payments with cash generated during these Chapter 11 Cases and orders of this Court authorizing use of cash collateral.

91.     Although the Debtors maintain that their access to cash collateral will provide sufficient assurance of postpetition payments to Utility Companies, the Debtors propose to deposit an amount equal to two (2) weeks' of their aggregate utility services, calculated based on the historical average over the twelve (12) month period ending before the Petition Date (the "Adequate Assurance Deposit"), into an interest-bearing, newly-created segregated account (the "Utility Deposit Account"), for the benefit of all of the Utility Companies, with such Utility Deposit Account to be held pending further order of the Court.

---

Debtors' Utility Companies, whether or not any given Utility Company is included on the Utility List. The Debtors have proposed a procedure for supplementing the Utility List. Additionally, it is possible that certain entities may have been mistakenly included on the Utility List and, therefore, the Debtors reserve the right to assert that any such entities are not Utility Companies for the purposes of this Motion or section 366 of the Bankruptcy Code.

92.     Absent the filing of an Objection (as defined below), each Utility Company shall be deemed to have: (a) stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment to such Utility Company within the meaning of section 366 of the Bankruptcy Code; and (b) waived any right to seek additional or different adequate assurance during the course of these Chapter 11 Cases.

93.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future utility service in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Companies to satisfy the requirements of section 366 of the Bankruptcy Code.

94.     If any Utility Company seeks to obtain the benefit of the Adequate Assurance Deposit on account of an alleged failure of the Debtors to pay any postpetition utility amount, such Utility Company shall request to be paid from the Utility Deposit Account as follows:

**First,** such Utility Company shall provide written notice of the alleged failure to pay such postpetition amount in the ordinary course of business between the Debtors and the Utility Company (the "Notice of Failure to Pay") to: (a) the Office of the United States Trustee for the Western District of Texas, Waco Division; (b) Proskauer Rose LLP, Three First National Plaza, 70 West Madison, Suite 3800, Chicago, Illinois 60602-4342, Attn:  Jeff J. Marwil and Grayson T. Walter; (c) King & Spalding LLP, 1100 Louisiana Suite 4000, Houston, Texas 77002, Attn: Henry J. Kaim; and (d) Bosque Power Company, LLC, c/o Arcapita Inc., 75 Fourteenth Street, 23rd Floor, Atlanta, Georga 30309, Attn: Layton Grisette (collectively, the "Notice Parties").  The Notice of Failure to Pay shall describe the postpetition amount the Utility Company alleges to not have been paid by the Debtors in the ordinary course of business and include the location(s) for which utility services are provided and the relevant account number(s) by which the Utility Company identifies the Debtors.

The Debtors are authorized in their sole discretion to pay, in accordance with orders granting use of cash collateral and other orders of this Court, amounts for unpaid postpetition utilities requested in any Notice of Failure to Pay.

**Second,** if the Debtors and the Utility Company fail to resolve the non-payment alleged in the Notice of Failure to Pay then, no less than ten (10) days after actual receipt by the

Notice Parties of the Notice of Failure to Pay, the Utility Company shall file a motion (the "Motion to Direct Payment") with the Court requesting entry of an order directing the Debtors to satisfy such unpaid amount from the Adequate Assurance Deposit. Such Motion shall set forth in detail (a) the basis for the Utility Company's allegation that the Debtors have failed to pay the Utility Company for postpetition utility services in the ordinary course of business, (b) the date that such requesting Utility Company issued the Notice of Failure to Pay to the Notice Parties (which date shall not be less than ten (10) days prior to the filing of such motion) and (c) any deposits, prepayments or other security currently held by such Utility Company.

**Third,** after a hearing on the Motion to Direct Payment and upon order of the Court, the Debtors may be directed to satisfy any unpaid postpetition amounts to such requesting Utility Company from the Utility Deposit Account.

95. Section 366 of the Bankruptcy Code can be construed to allow a Utility Company, on the twenty-ninth day following the Petition Date, to announce that the Debtors' Adequate Assurance is not acceptable, demand additional adequate assurance of payment of post-petition amounts, and terminate utility service the next day if the Debtors do not comply with their demand. While the Debtors do not concede that this is a correct reading of section 366 of the Bankruptcy Code, the Debtors' need for uninterrupted utility services during the course of their reorganization require that they seek protection of this Court from such measures. Accordingly, the Debtors request that Utility Companies be required to raise any objections to the Debtors' Adequate Assurance or the Motion by filing an objection (each, an "Objection") as set forth below.

96. The Debtors request that any Utility Company not satisfied with the Proposed Adequate Assurance must file a written Objection: (a) setting forth the type of utility service provided to the Debtors; (b) including a summary of the Debtors' payment history with respect to the utility accounts in question that, among other things, identifies any deposits or other security held by the Utility Company; and (c) setting forth why the Debtors' Adequate Assurance, including the Adequate Assurance Deposit, is not adequate assurance of the Debtors' payment of post-petition utility amounts. The Debtors request that any Objection be filed with

the Court and served on the Notice Parties no less than twenty (20) days after the Petition Date (as may be extended by written agreement of the Debtors and any Utility Company, the "Objection Deadline").  The Debtors further request that all Objections be heard within the first thirty (30) days after the Petition Date, which would remove the risk of last-minute demands from Utility Companies for adequate assurance greater than the Debtors' Adequate Assurance to be provided pursuant to the Utilities Motion.

97.     The Debtors request authority to resolve, in their sole discretion, any Objection by mutual agreement with the objecting Utility Company and, without further order of the Court and in connection with any such agreement, in their sole discretion, to provide an objecting Utility Company with additional adequate assurance of payment, including but not limited to cash deposits, prepayments and other forms of security.

98.     The Debtors respectfully request that this Court order that, unless a Utility Company files an Objection that is sustained by the Court, Utility Companies shall be forbidden to alter, refuse or discontinue utility service on account of any prepetition charges or require assurance of payment of post-petition utility amounts in addition to the Debtors' Adequate Assurance Deposit.

99.     The Debtors further request that this Court order that pending entry of the Final Order, Utility Companies shall be prohibited from discontinuing, altering or refusing service to the Debtors, including as a result for unpaid charges for prepetition services or as a result of any Objections.

100.     In order to resolve any Objections within thirty (30) days of the Petition Date, the Debtors request that the Court schedule the Final Hearing on any unresolved Objections approximately twenty-five (25) days after the Petition Date.  The Debtors shall send notice of the

Final Hearing, along with the Interim Order, to all Utility Companies identified on the Utility List no later than three (3) business days after entry of the Interim Order.

101.    It is possible that, despite the Debtors' best efforts, certain Utility Companies have not yet been identified by the Debtors or included on the Utility List.  To the extent that the Debtors identify additional Utility Companies, the Debtors will file amendments to the Utility List, and shall serve copies of the Interim Order and Final Order (when and if entered) on such newly-identified Utility Companies.  The Debtors request that any Interim Order and Final Order be binding on all Utility Companies regardless of when any given Utility Company was added to the Utility List and that all Utility Companies, including subsequently added Utility Companies shall be prohibited from altering, refusing, or discontinuing utility services to the Debtors absent further order of the Court.

102.    Based upon the foregoing, the Debtors believe that most, if not all, of their Utility Companies have adequate assurance of payment even _without_ the Adequate Assurance Deposit. When complemented by the Debtors' ability to pay through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is thus clearly "adequate."

103.    Moreover, if a Utility Company disagrees with the Debtors' analysis, the Utility Company may file an Objection and negotiate a resolution thereof with the Debtors and, if necessary, seek Court intervention without jeopardizing the Debtors' continuing operations.  If a Utility Company fails to file an Objection prior to any objection deadline established by this Court, such Utility Company should be deemed to consent to the Interim Order and should be bound by the Final Order.

1130/15973-001 Current/18289620v1

104.     Receiving the relief requested herein is essential for the Debtors to be able to carry out their reorganization efforts.  If the Utilities Motion is not granted, the Debtors could be forced to address voluminous requests by their Utility Companies in a disorganized manner at a critical point in their reorganization.  Moreover, the Debtors could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service, particularly gas, electric and telephone service, could essentially shut down operations, and any significant disruption of operations is likely to jeopardize the Debtors' reorganization efforts.

105.     Accordingly, the Debtors believe that the Utilities Motion should be granted.

**D.     Debtors' Emergency Motion for Entry of an Order Authorizing Assumption of Essential Operating Agreements (the "Motion to Assume Operating Agreements")**

106.     By the Motion to Assume Operating Agreements, the Debtors seek the entry of an order, authorizing the Debtors to assume the following Operating Agreements:  (a) Operation and Maintenance Agreement for the Bosque Eleectric Generating Facility by and between LS Power Acquisition Co I, LLC (as predecessor in interest to Debtor BPC) and Wood Group Power Operations (West), Inc. (as amended, the "Wood Group Agreement"), a copy of which is attached to the Motion to Assume Operating Agreements as Exhibit A; (b) Management Services Agreement dated January 4, 2010 among Debtor Partners, Debtor BPC and PurEnergy Management Services, LLC (the "PurEnergy Agreement"), a copy of which is attached to the Motion to Assume Operating Agreements as Exhibit B; and (c) Energy Management Agreement between EDF Trading North America, LLC ("EDF") and Debtor BPC dated February 1, 2010 (the "EDF Agreement"), a copy of which is attached to the Motion to Assume Operating Agreements as Exhibit C.

1130/15973-001 Current/18289620v1

107.     Pursuant to the terms of the Wood Group Agreement, Wood Group Power Operations (West), Inc. ("Wood Group") operates and maintains the Debtors' facility through the deployment of twenty-seven employees (the "Wood Group Employees"), some of whom are part-time hourly employees and some of whom are full-time salaried employees. Specifically, the Wood Group Employees, upon their receipt of dispatch orders from EDF, turn on the Debtors' facility to burn natural gas and generate electricity at the electric interconnection point. Without the Wood Group Employees, the Debtors' plant would neither operate nor be maintained. As compensation to Wood Group for the performance of the services described herein and in the Wood Group Agreement, the Debtors pay Wood Group, on a monthly basis (in accordance with the practice set forth in this paragraph) an operating fee, reimburseable expenses and, to the extent earned by Wood Group, an incentive payment. Accordingly, prior to the beginning of any given month (usually around the twenty-eighth day of the prior month), the Debtors pay to Wood Group $240,000 for services to be rendered during the following month, which payment includes amounts to compensate Wood Group for the services of the Wood Group Employees.[1] Following the end of that month (usually around the tenth day of the following month), the Debtors pay to Wood Group a "true-up" (*i.e.*, settlement) amount in the event that, under the terms of the Wood Group Agreement, Wood Group is entitled to additional compensation on account of actual services provided during the prior month. The "true-up" amount paid to Wood Group in any given month varies, but is typically around $50,000.

---

[1] Wood Group pays the Wood Group Employees biweekly (every other Friday), one week in arrears. Given that Wood Group pays the Wood Group Employees, and the Debtors simply reimburse Wood Group on account of such payments, the statutory caps set forth in sections 507(a)(4) and 507(a)(5) do not apply to the Debtors. That notwithstanding, Wood Group's books and records indicate that in no instance should the amount of prepetition wages, salaries, and contractual compensation owing to any Wood Group Employee as of the Petition Date exceed the statutory caps.

108.     Pursuant to the terms of the PurEnergy Agreement, PurEnergy serves as the Debtors' asset manager, facilitating the Debtors' ability to generate gross margin to cover variable and fixed costs.   Specifically, PurEnergy:   (a) manages the Debtors' cash flow; (b) provides an accounting of revenue, expenses and changes to the balance sheet; (c) makes major decisions for the Debtors; and (d) serves as the commercial interface with parties in interest (*e.g.*, Wood Group, EDF, General Electric, all vendors (except for gas fuel) and service providers that facilitate the Debtors' operations, the Prepetition Agent, the Debtors' relationship bank, regulatory agencies, Bosque County Commissions, neighbors, water supplier and gas lateral provider).  PurEnergy also employs an on-site two-person construction management team (the "PurEnergy Employees"),[1] without whom the Debtors would be unable to complete necessary construction clean-up work.  Each month (usually around the twenty-fifth day thereof), the Debtors pay to PurEnergy, on account of services rendered during the prior month, a flat fee of $24,166.67, and reimburse PurEnergy, on account of its actual expenses incurred during the prior month, for travel, compensation paid to the construction management team and other out-of-pocket expenses.

109.     Pursuant to the terms of the EDF Agreement, EDF is the Debtors' qualified scheduling entity (QSE) and the commercial interface between sellers of gas, buyers of electricity and the Electric Reliability Council of Texas ("ERCOT").   ERCOT, as the independent system operator, buys ancillary services and real-time energy from EDF and, in

---

[1]  PurEnergy pays the two PurEnergy Employees biweekly, two weeks in arrears; in addition, PurEnergy pays to one PurEnergy Employee, $99 per day per diem, and to the other PurEnergy Employee, expense reimbursements.  Each month, the Debtors reimburse PurEnergy on account of such payments and other expenses (including a benefits burden attributable to the PurEnergy Employees) incurred during the prior month.  Given that PurEnergy pays the PurEnergy Employees, and the Debtors simply reimburse PurEnergy on account of such payments, the statutory caps set forth in sections 507(a)(4) and 507(a)(5) do not apply to the Debtors.  That notwithstanding, PurEnergy's books and records indicate that in no instance should the amount of prepetition wages, salaries, and contractual compensation owing to either PurEnergy Employee as of the Petition Date exceed the sum of exceed the statutory caps.

turn, EDF buys it from the Debtors.  Without EDF, the Debtors would be unable to transact with the market and generate gross margin.  On approximately the twenty-fifth day of each month, EDF pays to the Debtors, on account of energy purchased from the Debtors by EDF during the prior month, a net amount equal to aggregate gross margin (*i.e.*, revenue less cost of sales, resulting in positive net revenue) minus a monthly fee (*i.e.*, the greater of four percent of gross margin or $10,000) and an amount equal to EDF's actual telecommunication expenses.

110.    The Operating Agreements, which in many ways give rise to claims similar to those of employees for wages, salaries, expenses, and benefits and on account of which claims courts routinely grant debtors "first-day" authority to pay, are essential to the Debtors' operations.  In short, without any one of the Wood Group, PurEnergy or EDF, the Debtors are incapable of functioning (and are thus incapable of generating any revenue).  Although the Debtors have prepetition obligations under the Operating Agreements, none of them is past due. Therefore, rather than making payments of the Cure Amounts as of the date of entry of the Order, the Debtors propose to continue to, in the ordinary course of business, perform under the Operating Agreements, including paying the Cure Amounts to the counterparties to the Operating Agreements in the ordinary course as they come due.

111.    The Debtors have evaluated each of the Operating Agreements and, in the exercise of their business judgment, have determined that the Debtors' assumption of the Operating Agreements will promote stability and growth in the Debtors' business, by providing those transacting business with the Debtors with the assurance that their energy supply needs will be met.  Accordingly, the assumption of the Operating Agreements is in the best interests of the Debtors, their estates, their creditors and parties in interest.

1130/15973-001 Current/18289620v1

112.    The Debtors believe that they are current (within terms) on payments to Wood Group, PurEnergy and EDF and, accordingly, will pay the Cure Amounts pursuant to section 365(b)(1)(A) of the Bankruptcy Code in the ordinary course of business.  As such, the Debtors are not required to establish "adequate assurance of future performance" under section 365(b)(1)(C) of the Bankruptcy Code.  Nonetheless, for the avoidance of doubt, the Debtors also assert that they have provided adequate assurance of future performance to the counterparties to the Operating Agreements.  In the present case, the Debtors anticipate having sufficient cash from operations and use of other cash collateral to make all payments due under the Operating Agreements.  The Debtors fully intend to make all such payments to the counterparties to the Operating Agreements in the ordinary course of business.

113.    For the foregoing reasons, the Debtors, in the exercise of their business judgment, have determined that it is in the best interests of their estates to assume the Operating Agreements effective as of the date of the order approving their assumption.

Dated:  March 24, 2010
        Waco, Texas

                        **Bosque Power Company, LLC**
                        **BosPower Development LLC**
                        **BosPower Development Blocker I Inc.**
                        **BosPower Development Blocker II Inc.**
                        **BosPower Partners LLC**
                        **Fulcrum Marketing and Trade LLC**

                        /s/  Brian R. McCabe
                        _____
                        Brian R. McCabe

1130/15973-001 Current/18289620v1